## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

INTERNATIONAL PAINTERS AND ALLIED      )
TRADES INDUSTRY PENSION FUND           )
                                       )
                    Plaintiff          )        CIVIL ACTION NO.
        v.                             )        1:06-CV-02168 (GK)
                                       )
STATELINE GLASS & MIRROR, INC. et al.  )
                                       )
                    Defendants         )

## MOTION FOR ENTRY OF DEFAULT JUDGMENT

Plaintiff, the International Painters and Allied Trades Union Industry Pension Fund

("Pension Fund" or "Plaintiff"), respectfully moves this Court for entry of judgment by default

against Defendants, Stateline Glass & Mirror, Inc. ("Company") and Curtis W. Arft ("Individual

Defendant" and together with Company "Defendants"), jointly and severally, in the amount of

$75,390.62, which includes contributions, interest, liquidated damages and attorneys' fees and

costs incurred by the Pension Fund pursuant to 29 U.S.C. §185(a) and 1132(g)(2)(A) through

(D), and for injunctive relief.

In support of this Motion, Plaintiff relies upon the allegations in its Complaint, the

Declaration of Thomas Montemore[1] and the Declaration of Sanford G. Rosenthal.[2]

The grounds for this Motion are as follows:

1.      Prior to the commencement of this action, the Plaintiff attempted to resolve this

delinquency in an amicable manner.

---

[1]      The Declaration of Thomas Montemore ("Montemore Declaration") is attached to this Motion as Exhibit 1.
The exhibits referenced in the Montemore Declaration are attached as Exhibits 2-3.
[2]      The Declaration of Sanford G. Rosenthal ("Rosenthal Declaration") is attached to this Motion as Exhibit 4.
The exhibits referenced in the Rosenthal Declaration are attached to this Motion as Exhibits 5-7.
185627-1

2.      The requested payments were not received and the Complaint in this matter was filed on December 19, 2006.  The Complaint was served on Individual Defendant on January 6, 2007.  The Complaint was served on Company on February 15, 2007.  The Affidavits of Service have been duly filed with the Court.

3.      No Answer to the Complaint has been filed by the Defendants.

4.      On July 19, 2007, Plaintiff filed a Request to Clerk to Enter Default against the Defendants pursuant to Fed. R Civ. P. 55(a). A copy was sent via first-class mail, postage prepaid, to the Defendants.

5.      On July 25, 2007, the Clerk of the Court entered default against all Defendants.

6.      Defendants are neither infants nor incompetent people and the Individual Defendant is not in the military service.

**WHEREFORE**, Plaintiff seeks the following relief:

(a)      Judgment entered as set forth in the proposed Order and Judgment attached to this Motion; Such other and further relief as the Court deems just, necessary and appropriate.

Respectfully submitted,

JENNINGS SIGMOND, P.C.
 /s/ Sanford G. Rosenthal
SANFORD G. ROSENTHAL
Bar No. 478737
The Penn Mutual Towers, 16th Floor
510 Walnut Street, Independence Square
Philadelphia, PA 19106-3683
(215) 351-0611/0660
Attorneys for the Fund

Date:  July 26, 2007
OF COUNSEL:
JEROME A. FLANAGAN
The Penn Mutual Towers, 16th Floor
510 Walnut Street, Independence Square
Philadelphia, PA 19106-3683
(215) 351-0660

185627-1

2

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| INTERNATIONAL PAINTERS AND ALLIED | ) | |
| TRADES INDUSTRY PENSION FUND | ) | |
| | ) | |
| Plaintiff | ) | CIVIL ACTION NO. |
| v. | ) | 1:06-CV-02168 (GK) |
| | ) | |
| STATELINE GLASS & MIRROR, INC. et al. | ) | |
| | ) | |
| Defendants | ) | |

## ORDER AND JUDGMENT BY DEFAULT AGAINST DEFENDANTS

Upon consideration of the Complaint and Plaintiff's Motion for Entry of Judgment by

Default, the supporting Memorandum, declarations and attached Exhibits, it appears to the Court

that Defendants were served with process and have inexcusably, knowingly and willfully failed

to appear, plead or otherwise defend, and the default against said Defendants having been

entered, the Court **FINDS:**

A.     Defendants, Stateline Glass & Mirror, Inc. ("Company") and Curtis W. Arft

("Individual Defendant" and together with Company "Defendants") are bound to collective

bargaining agreements requiring them to remit fringe benefit contributions and other sums to

Plaintiff.

B.     Defendants have failed to remit to Plaintiff the fringe benefit contributions and

other sums required by the collective bargaining agreement.

C.     Individual Defendant guaranteed amounts due to the Plaintiff by the Company

and since Company has failed to submit all monthly reports and payments, he is personally liable

for all amounts due to Plaintiff.

185627-1

Consistent with these findings, it is **ORDERED**:

1.     Plaintiff's Motion is Granted.

2.     Pursuant to Rule 55(b)(2) of the Federal Rules of Civil Procedure and 29 U.S.C. §1132(g)(2)(A) through (E), judgment is entered in favor of Plaintiff, International Painters and Allied Trades Industry Pension Fund ("Pension Fund" or "Plaintiff"), and against Defendants, jointly and severally, in the amount of $75,390.62, which consists of the following:

(a)     Unpaid contributions in the amount of $56,533.09 the period June 2006 through May 2007 and for the balance of the Promissory Note and Personal Guarantee signed by Defendants on May 24, 2006;

(b)     Liquidated damages in the amount of $11,306.62;

(c)     Interest through July 15, 2007 in the amount of $3,007.52. The contribution amount in Paragraph 2(a) shall continue to bear interest as provided in 29 U.S.C. §1132(g)(2)(B) and 26 U.S.C. §6621, as from time to time amended, until the date of actual payment.

(d)     $4,543.39, representing the attorneys' fees and costs incurred in the collection and enforcement of this action through July 23, 2007, in accordance with 29 U.S.C. §1132(g)(2)(D).

3.     Defendants, their owners, officers, agents, servants, attorneys and all other persons acting on their behalf or in conjunction with them shall be and hereby are restrained and enjoined from refusing to file complete, proper and timely remittance reports with the accompanying contributions and dues for all periods Defendants are obligated to do so under the collective bargaining agreement(s);

185627-1

4.     Within ten (10) days of the entry of this Order, Defendants shall fully and accurately complete and submit to the Plaintiff any and all outstanding remittance reports, including but not limited to reports and contributions for the period July 2006 through May 2007, together with a check for the full amount of the contributions and dues due, including interest and liquidated damages.

5.     Within twenty (20) days of a request by Plaintiff or its counsel, Defendants shall make available to the designated representative of the Plaintiff all payroll books and related records necessary for Plaintiff to ascertain the precise amount of any delinquent contributions due and owing to Plaintiff for all periods in which Defendants are obligated to make fringe benefit contributions to the Plaintiff and Defendants shall bear the costs of said audit.

6.     Plaintiff shall have the right to conduct future audits for all relevant periods, including the time periods covered by this judgment. Defendants shall be and hereby are restrained and enjoined from failing and refusing to submit to such audits by certified public accountants selected by Plaintiff and shall produce all payroll books and related records requested by Plaintiff, including, but not limited to, payroll, wages, general ledger and cash disbursement records, compensation insurance audits and by other pertinent records deemed necessary for the purpose of ascertaining and/or verifying payments and/or liabilities to Plaintiff. Defendants shall pay Plaintiff any additional amounts found owing, plus such other amounts as set forth in the Agreement, the Agreement and Declaration of Trust of the Pension Fund, the International Painters and Allied Trades Industry Pension Plan, ERISA or any other applicable law.

7.     If additional delinquencies are discovered pursuant to the submission of the remittance reports or to the audit referred to above, or as a result of additional information that

185627-1

becomes available to the Plaintiff, the Plaintiff may apply to the Court for an additional or supplemental judgment reflecting any additional delinquencies, interest, liquidated damages, attorneys' fees and costs, pursuant to ERISA, 29 U.S.C. §1132(g)(2) together with any audit costs incurred by the Plaintiff.

8.    If any such further action by the Plaintiff is required, it may apply to this Court or to the court in which enforcement is sought, for such further reasonable attorneys' fees and costs in addition to those set out in Paragraph 2(d) above. See, Trucking Employees of North Jersey Welfare Fund, Inc. v. Bellezza Co., 57 Fed. Appx. 972 (3d Cir. 2003); International Painters and Allied Trades Industry Pension Fund v. H.W. Ellis Painting Co., Inc., No. 03-1125, slip. op. at *3 (D.D.C. February 10, 2004) (citing Free v. Briody, 793 F.2d 807 (7th Cir. 1986); Sheet Metal Workers Health and Welfare Trust Fund v. Big D Service Co., 867 F.2d 852 (10th Cir. 1989)).

9.    If Defendants fail to comply with any of the terms of this Order, the Plaintiff may, in addition to pursuing the remedies provided for under Federal Rule of Civil Procedure 69, reopen this case upon motion to the Court and notice to the Defendants, and may at that time ask for further appropriate monetary and/or injunctive relief.

BY THE COURT

Date:_____    By: _____
                                         Gladys Kessler,                    J.
                                         United States District Judge

185627-1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

INTERNATIONAL PAINTERS AND ALLIED )
TRADES INDUSTRY PENSION FUND )
                                   )
            Plaintiff         )     CIVIL ACTION NO.
    v.                      )     1:06-CV-02168 (GK)
                                   )
STATELINE GLASS & MIRROR, INC. et al. )
                                   )
           Defendants     )

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR JUDGMENT BY DEFAULT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 55(b) AGAINST DEFENDANTS.

Plaintiff, the International Painters and Allied Trades Union Industry Pension Fund ("Pension Fund" or "Plaintiff"), by its legal counsel, submits this Memorandum of Law in Support of its Motion for Judgment by Default.[1]

The Plaintiff served its Complaint on Defendant, Stateline Glass & Mirror, Inc. ("Company") on February 15, 2007 and on Defendant, Curtis W. Arft ("Individual Defendant" and together with Company "Defendants"), on January 6, 2007. To date, Defendants have failed to answer the Complaint or otherwise defend this action. On July 24, 2007, Plaintiff filed a Request For Entry of Default against Defendants pursuant to Rule 55(a) of the Federal Rules of Civil Procedure. The default was entered against all defendants on July 25, 2007.

In light of Defendants' default and Defendants' continuing failure to appear or otherwise defend, the Pension Fund is entitled to judgment by default against Defendants without a hearing. Fed. R. Civ. P. 55(b); United States v. De Frantz, 708 F. 2d 310 (7th Cir. 1983);

---

[1]    Attached to the Motion accompanying this Memorandum are the Declarations of Thomas Montemore ("Montemore Declaration") and Sanford G. Rosenthal ("Rosenthal Declaration"). Also attached is a proposed form of Default Judgment.

Draisner v. Liss Realty, 211 F. 2d 808 (1954). Moreover, where defendants, such as those here, fail to respond to the Complaint, all factual allegations in the Complaint are deemed admitted. Thomson v. Wooster, 114 U.S. 104 (1885); Au Bon Pain Corp. v. Artect, Inc., 653 F 2d 61 (2d Cir. 1981); U.S. ex. Rel. v. Carr, 567 F. Supp. 831, 840 (W.D. MI 1983). General allegations of fact are also deemed true. Danning v. Lavin, 572 F. 2d 1386, 1388-89 (9th Cir. 1978) (allegations of insolvency pled in general terms held sufficient to support a finding of fraudulent conveyance or voidable preference).

Defendants were and have been party to collective bargaining agreements (singly or jointly "Labor Contracts") with the various local unions and district councils affiliated with the International Union of Painters and Allied Trades, AFL-CIO-CFC ("International" or "Union"). See, Exhibit 1, Montemore Declaration, ¶6; Exhibit 2, true and correct copies of relevant provisions from the Labor Contracts. Under the Labor Contract, Defendants are required to remit fringe benefit contributions and other sums to Plaintiff. See, Exhibit 1, Montemore Declaration, ¶¶6-7; Exhibit 2, Labor Contracts. The failure to pay these fringe benefit contributions and other amounts results in a delinquency to the Plaintiff.

In addition, prior to the commencement of this lawsuit the Pension Fund and the Defendants entered into a settlement agreement in an effort to collect amounts owed to the Pension Fund by Defendants. The agreement was reached in May 2006. Pursuant to the terms of the Promissory Note ("Note") and Personal Guarantee ("Guarantee") executed on May 24, 2006, by Individual Defendant, the Pension Fund settled the delinquencies and was to receive payments totaling $16,612.93. Defendants defaulted on the Note as a result of failing to pay the monthly installments and current contributions. True and correct copies of the Note and Guarantee are attached as Exhibit 3.

**ARGUMENT**

A.    **ENTRY OF JUDGMENT AGAINST DEFENDANTS, JOINTLY AND SEVERALLY, FOR UNPAID CONTRIBUTIONS, INTEREST, LIQUIDATED DAMAGES AND ATTORNEYS' FEES AND COSTS IS ENTIRELY APPROPRIATE**

Defendants are parties to one or more Labor Contracts with the Union. See, Exhibit 1, Montemore Declaration, ¶6; Exhibit 2, Labor Contracts. The Labor Contracts provide for the payment of contributions to the Pension Fund for time worked by or paid to employees who perform work covered by its terms and conditions. See, Exhibit 1, Montemore Declaration, ¶7; Exhibit 2, Labor Contracts. Failure to make these contributions, or to submit either incorrect or late remittance reports, results in a delinquency to the Pension Fund. Ibid. Under the Labor Contracts, the Pension Fund also has the right to audit the signatory's payroll books and related records to determine that all of the required contributions have been paid. See, Exhibit 1, Montemore Declaration, ¶¶6,13; Complaint, Exh. 1; Exh.2, Labor Contracts.  Finally, under the terms of the Labor Contracts, the employer agrees to be bound by the Agreement and Declaration of Trust of the Pension Fund ("Trust Agreement," attached as Exhibit 1 to the Complaint filed in this matter and incorporated by reference) and the International Painters and Allied Trades Industry Pension Plan ("Plan," attached as Exhibit 2 to the Complaint filed in this matter and incorporated by reference) and by all amendments thereto and actions taken by the trustees of the Pension Fund. See, Complaint, ¶¶ 8-9; Exhibit 1, Montemore Declaration, ¶6; Exhibit 2, Labor Contracts.

Furthermore, Section 515 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §1145, provides:

> Every Employer who is obligated to make contributions to a bargained agreement shall … make contributions in accordance with … such agreement.

If an employer fails to make the contributions as required by the collective bargaining agreement and Section 515 of ERISA, then the employer is subject to the provisions of Section 502(g)(2) of ERISA, 29 U.S.C. § 1132(g)(2). Section 502(g)(2) provides for the mandatory award of the following if a judgment is entered in the Pension Fund's favor pursuant to Section 515:

A.    the unpaid contributions;

B.    interest on the unpaid contributions;[2]

C.    an amount equal to the greater of:

    (i)    interest on the unpaid contributions; or

    (ii)   liquidated damages provided for under the plan in an amount not in excess of 20 percent (or such higher percentage as may be permitted under Federal or State law) of the amount determined by the Court under subparagraph (a);[3]

D.    reasonable attorneys' fees and costs of the action, to be paid by the Defendants; and

E.    such other legal or equitable relief as the court deems appropriate.

Company has defaulted on the Agreement and has failed to submit contributions and/or remittance reports for the period June 2006 through May 2007. See, Exhibit 1, Montemore Declaration, ¶8-9. As a result, Plaintiff is entitled to judgment in at least the amount of $75,390.62.

---

[2]    Section 10.12(b)(2) of the Plan sets the interest rate on delinquent contributions according to the Internal Revenue Service rate for delinquent taxes. See, Complaint, Exhibit 2.

[3]    ERISA and §10.12(b)(3) of the Plan's rules and regulations mandate that liquidated damages be awarded in an amount equal to the greater of interest or twenty percent (20%) of unpaid contributions due at the commencement of the lawsuit and those which become delinquent during the course of the litigation. See, Complaint, Exhibit 2. Article VI, Sec. 4 of the Trust Agreement also provides for the assessment of liquidated damages on contributions paid after the due date. See, Complaint, Exhibit 1.

1. **Defendants owe contributions in at least the amount of $56,533.09**

Defendants, by breaching the Promissory Note and Personal Guarantee, owe the

Pension Fund $10,683.72. See Exhibit 1, Montemore Declaration, ¶8. Further, Defendants have

failed to submit the required contributions for June 2006 in the total amount of $720.00. See

Exhibit 1, Montemore Declaration, ¶9. Defendants have also failed to submit contributions for

the period July 2006 through May 2007 in the estimated amount of $45,129.37. See Exhibit 1,

Montemore Declaration, ¶9. This amount is estimated because the Defendants have failed to

submit the contractually-required remittance reports. The estimated contributions are calculated

by the Pension Fund based on the average of the last three months of remittance reports filed by

Company. See, Exhibit 1, Montemore Declaration, ¶9. Therefore, Defendants owe a total of at

least $56,533.09 in contributions.

2. **Defendants owe interest in the amount of $3,007.52**

The rules and regulations as set forth in §10.12(b)(2) of the Plan set the interest rate on

delinquent contributions according to the Internal Revenue Service rate for delinquent taxes.

Interest accruing through July 15, 2007 on Defendants' delinquent contributions totals

$3,007.52. See, Exhibit 1, Montemore Declaration, ¶10; 29 U.S.C. §1132(g)(2)(B); 26 U.S.C.

§6621. Interest will continue to accrue until the amounts are paid.

3. **Defendants owe liquidated damages in the amount of $11,306.62**

ERISA and §10.12(b)(3) of the Plan's rules and regulations mandate that liquidated

damages be awarded in an amount equal to the greater of interest or twenty percent (20%) of

unpaid contributions due at the commencement of the lawsuit and those which become

delinquent during the course of the litigation. Article VI, Sec. 4 of the Pension Fund's Trust

Agreement also provides for the assessment of liquidated damages on contributions paid after the due date. The total amount of liquidated damages is $11,306.62.  The amount of liquidated damages is greater than the interest due ($3,007.52). Therefore, Defendants owes $4,263.32 in liquidated damages. See, Exhibit 1, Montemore Declaration, ¶11; 29 U.S.C. §1132(g)(2)(C).

4.    **Defendants owe attorneys' fees in the amount of $4,543.39**

Plaintiff has incurred $4,543.39 in attorneys' fees and costs in connection with this matter through July 23, 2007. See, Exhibit 4, Rosenthal Declaration, ¶2; Exhibit 5. See, 29 U.S.C. §1132(g)(2). The Pension Fund is entitled to reimbursement of all attorneys' fees and costs it incurs in connection with the enforcement and collection of any judgment entered by the Court. See, International Painters and Allied Trades Industry Pension Fund v. H.W. Ellis Painting Co., Inc., No. 03-1125, slip. op. at *3 (D.D.C. February 10, 2004) (citing Free v. Briody, 793 F.2d 807 (7th Cir. 1986); Trucking Employees of North Jersey Welfare Fund, Inc. v. Bellezza Co., 57 Fed. Appx. 972 (3d Cir. 2003); Sheet Metal Workers Health and Welfare Trust Fund v. Big D Service Co., 867 F.2d 852 (10th Cir. 1989)).  Therefore, Defendants owe $4,543.39 in attorneys' fees and costs.

5.    **The Pension Fund is entitled to injunctive relief**

The failure of Defendants to comply with their contractual and statutory obligations results in a substantial adverse impact on the Pension Fund's ability to meet its legal obligations. The Pension Fund is obligated by express mandates of ERISA and by the documents and instruments by which it is administered to provide benefits and pension credits to all of Company's employees who are otherwise eligible to receive them. 29 C.F.R. 2530-200b-2(a)(1) and (2); Central States, S.E. & S.W. Areas Pension Fund v. Admiral Merchants Motor Freight, Inc., 511 F.Supp. 38 (D.Minn. 1980), aff'd sub. nom., Central States, S.E. & S.W. Areas Pension

Fund v. Jack Cole-Dixie Highway Co., Inc., 642 F.2d 1122 (8th Cir. 1981). The Pension Fund is required to provide these benefits and credits regardless of whether Defendants make the contributions. For example, if employees perform work covered by the collective bargaining agreement, the Pension Fund has affirmative obligations to credit hours for retirement benefits regardless of whether a signatory employer makes contributions to the Pension Fund. The result of Company's non-compliance with ERISA and the Labor Contract is a significant drain on the Pension Fund's resources.

Additionally, where, as here, Defendants fail to remit their contributions, the Pension Fund loses the income that it would have earned by investing those contributions. Combining this loss of investment income with the Pension Fund's requirement to continue paying benefits to Company's employees (as well as to the employees of other signatory contractors) will eventually affect the actuarial soundness of the Pension Fund as well as deplete the resources available to pay current pension benefits.

Furthermore, the Pension Fund incurs additional administrative expenses as a result of Defendants' failure to pay their contributions. These losses and added expenses significantly impair the Pension Fund's ability to continue to provide benefits to not only Company's employees, but also to employees of companies that comply with their contractual obligations.

In light of Defendants' failure to comply with their contractual and statutory obligations to the Pension Fund to submit timely, accurate remittance reports and pension contributions each month, and the irreparable harm which Defendants' malfeasance causes the Pension Fund, the Pension Fund respectfully requests the injunctive relief which is set forth in its proposed default judgment. Laborers' Fringe Benefit Funds v. Northwest Concrete, 640 F.2d 1350, 1352 (6th Cir. 1981); IBPAT Union and Industry Pension Fund v. Hartline-Thomas, Inc. , 4 EBC 1199, 1200

(D.D.C. 1983); <u>Teamsters Local 639 - Employers Trust v. Jones & Artis Construction Co.</u>, 640

F.Supp. 223 (D.D.C. 1986).

**B.      COMPANY SHOULD BE ORDERED TO PRODUCE THE
        APPROPRIATE RECORDS TO ALLOW THE PENSION FUND TO
        AUDIT ITS PAYROLL BOOKS AND RELATED RECORDS AND
        DEFENDANTS MUST PAY ANY ADDITIONAL AMOUNTS FOUND TO
        BE DUE AND OWING**

The determination of an employee's eligibility for benefits is made based upon

information contained in the remittance report, to be filed monthly by each and every signatory

employer. A proper determination of eligibility is not possible if remittance reports are not

submitted or if they contain incorrect information. <u>See</u>, 29 U.S.C. §1132(g)(2)(E) (equitable

relief); <u>Teamsters Local 639 – Employers Trust v. Jones & Artis Construction Co.</u>, 640 F.

Supp.223 (D.D.C. 1986); <u>IBPAT Union and Industry Pension Fund v. Hartline – Thomas, Inc.</u>, 4

EBC 1199, 1200 (D.D.C. 1983); <u>Laborers' Fringe Benefit Pension Fund v. Northwest Concrete</u>,

640 F. 2d 1350, 1352 (6th Cir. 1981).

In order to determine whether the contributing employer has made all required

contributions and correctly reported hours worked and paid to its employees, the Pension Fund

has the right to review all of the employer's records that relate to its contributory obligation.

<u>Central States, S.E. & S.W. Areas Pension Fund v. Central Transport, Inc.</u>, 472 U.S. 559, 105

S.Ct. 2833 (1985). The employer has the obligation to maintain appropriate records and to permit

the Pension Fund's auditors to review those records upon request. <u>Michigan Laborers' Health

Care Fund v. Grimaldi Concrete, Inc.</u>, 30 F.3d 692, 695 (6th Cir. 1994).

In the present case, the Labor Contracts and Trust Agreement obligate Defendants to

allow the audit. <u>See</u> Exhibit 1, Montemore Declaration, ¶¶6-13; Exhibit 2, Labor Contracts;

Complaint, Exhibit 1, Art. VI, Sec. 6.  The scope of records subject to review is broad, and

include those records the auditors reasonably deem necessary to conduct an audit. DeMarco v. C & L Masonry, 891 F.2d 1236 (6th Cir. 1989).   In addition to the routine payroll records (e.g., time cards, cancelled payroll checks, payroll ledgers and payroll tax returns), they can include the general check registers and cancelled checks, general disbursements ledgers and federal and state corporate income tax returns. Ibid.

An audit is necessary in this case in order to determine the exact amount due to the Pension Fund because of Defendants' failure to submit contractually-required remittance reports and furthermore, to ensure that the remittance reports submitted by Defendants are correct. See Exhibit 1, Montemore Declaration, at ¶¶12-13. The Company's obligations under the Agreement and 29 U.S.C. § 1145 mean nothing if the Pension Fund cannot ensure compliance through an audit. The Court should order Company to produce its records for an audit for all periods in which the Defendants are obligated to make contributions to the Pension Fund so that a precise determination of the amount owed can be made. Upon completion of the audit, the Court should enter a further judgment against Defendants for all additional amounts found to be due and owing under the Agreement and ERISA.

## CONCLUSION

Plaintiff, therefore, requests that the Court enter a judgment against Defendants, jointly and severally, in the amount of $75,390.62, which includes $4,543.39 in attorneys' fees and costs, order Defendants to submit the remittance reports and corresponding contributions together with interest and liquidated damages and order Company to produce its payroll books and related records for an audit for all periods in which the Company is obligated to make fringe benefit contributions to the Pension Fund.

In light of the clear statutory intent of ERISA, it is respectfully requested that this Court

grant the Pension Fund the relief requested in the Motion for Default Judgment.

Respectfully submitted,

JENNINGS SIGMOND, P.C.

 /s/ Sanford G. Rosenthal
SANFORD G. ROSENTHAL
Bar No. 478737
The Penn Mutual Towers, 16th Floor
510 Walnut Street, Independence Square
Philadelphia, PA 19106-3683
(215) 351-0611/0660
Date: July 26, 2007     Attorneys for the Fund

OF COUNSEL:
JEROME A. FLANAGAN
The Penn Mutual Towers, 16th Floor
510 Walnut Street, Independence Square
Philadelphia, PA 19106-3683
(215) 351-0660

## CERTIFICATE OF SERVICE

I, SANFORD G. ROSENTHAL, ESQUIRE, state, under penalty of perjury, that the foregoing Motion for Judgment by Default by the Court pursuant to Federal Rule of Civil Procedure 55(b)(2) against Defendants was served by mailing same first class mail, postage prepaid, on the date listed below to:

STATELINE GLASS & MIRROR, INC.
372 Marshall Drive
Antioch, IL 60002

And

CURTIS ARFT
372 Marshall Drive
Antioch, IL 60002

s/ Sanford G. Rosenthal
SANFORD G. ROSENTHAL, ESQUIRE

Date: July 26, 2007

**THIS DOCUMENT HAS BEEN ELECTRONICALLY FILED AND IS AVAILABLE FOR VIEWING AND DOWNLOADING FROM THE ECF SYSTEM**

185627-1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| INTERNATIONAL PAINTERS AND ALLIED TRADES INDUSTRY PENSION FUND | ) ) ) | |
| Plaintiff | ) | CIVIL ACTION NO. |
| v. | ) | 1:06-CV-02168 (GK) |
| STATELINE GLASS & MIRROR, INC. et al. | ) ) | |
| Defendants | ) | |

## DECLARATION OF THOMAS MONTEMORE

THOMAS MONTEMORE states and declares the following:

1.      My name is Thomas C. Montemore and I am the Assistant to the Fund Administrator of the International Painters and Allied Trades Union and Industry Pension Fund ("Pension Fund", "Fund" or "Plaintiff"). I have held that position since February 1, 2000. I served as Delinquency Controller from 1988 through October 31, 2000 and I have served as the Delinquency Coordinator from 1986 to 1988, and before that, acted as Agreement Clerk from 1982 to 1986, and File Clerk beginning in 1979.

2.      The Pension Fund is an "employee benefit pension plan" as defined in Section 3(2)(A)(i) of ERISA, as amended, 29 U.S.C. §1002(A)(i), established by the International Union of Painters and Allied Trades, AFL-CIO-CFL ("Union"), and employers in private industry whose employees are members of or otherwise represented by the Union and its district councils and local unions, for the purpose of providing retirement income to the employees. The Pension Fund is administered in the District of Columbia from its and my principal place of business at 1750 New York Avenue, N.W., Washington, D.C. 20006.


EXHIBIT
1

3.     I have personal knowledge of the contents of the collective bargaining agreements, the Agreement and Declaration of Trust ("Trust Agreement") and the International Painters and Allied Trades Industry Pension Plan ("Plan") referenced in this Motion.

4.     The Pension Fund, as part of its normal operating procedure, maintain files containing copies of the collective bargaining agreements signed by each employer and copies of the remittance reports submitted by each contributing employer. The Pension Fund also maintains, as part of its normal operating procedures, a record of all contributions which are paid to the Pension Fund by each contributing employer, including copies of checks submitted directly from employers as payment for contributions due.

5.     Defendant, Stateline Glass & Mirror, Inc. ("Company") is an Illinois corporation located in Antioch, Illinois. Curtis W. Arft ("Individual Defendant" and together with Company "Defendants") is the President of Company.  See Exhibit 3.   In addition, Individual Defendant guaranteed the statutory and contractual liabilities of Company by signing a Promissory Note ("Note") and Personal Guarantee ("Guarantee") on May 24, 2006.  True and correct copies of the Note and Guarantee are attached as Exhibit 3.

6.     Defendants are currently employers that are party to or bound by collective bargaining agreements ("Labor Contracts") with the Union.  True and correct copies of relevant provisions of the Labor Contracts are attached as Exhibit 2. Under the terms of the Labor Contracts, Company is bound to the Trust Agreement and Plan. See, Exhibit 2, Labor Contract, Art. VII, Section 2.

7.     The Labor Contracts require Company to submit monthly contributions to the Pension Fund on behalf of all employees in the bargaining unit, and set forth the rate of contribution and the method for calculating the total amount of contributions due the Pension

185629-1

2

Fund. Contributions must be made for each hour for which employees receive pay at the contribution rate specified in the agreements. Failure to make the required contributions, or to submit either incorrect or late remittance reports and contributions, results in a delinquency to the Pension Fund.

8.      The Defendants previously incurred contribution delinquencies to the Fund.  In settlement of those delinquencies, the Defendants entered a settlement agreement with the Pension Fund on May 24, 2006 by signing a Promissory Note and Personal Guarantee ("May 24, 2006 Settlement") for the principal sum of $16,354.40.  See, Exhibit 3.  The Defendants' failure to timely remit either an installment under the May 24, 2006 Settlement or future fringe benefit contributions payments to the Pension Fund were among the grounds for default under the terms of the May 24, 2006 Settlement.  Individual Defendant personally guaranteed the settlement payments and Company's other contributory obligations.  See Exhibit 3.  Defendants breached the terms of the May 24, 2006 Settlement by failing to make all of the required payments under the agreement to the Pension Fund.

9.      Based upon information currently available to the Pension Fund, Defendants presently owe the Pension Fund contributions for the period June 2006 through May 2007 in the amount of at least $56,533.09.  This amount includes $10,683.72 for the balance of the Promissory Note and Personal Guarantee.  It also includes $720.00 for unpaid contribution amounts owed to the Pension Fund based on reports submitted by the Defendants for June 2006. Lastly, this amount includes estimated contributions owed to the Pension Fund for the period of July 2006 through May 2007, a period for which Defendants have failed to submit both contributions and remittance reports to the Pension Fund.  For the period in which the Pension Fund has not received remittance reports and corresponding contributions, the Pension Fund is

forced to estimate an amount due from Defendants. The estimate is reached by averaging the

three months of contributions prior to the first month in which no report is received. Using this

methodology, the Pension Fund has calculated the amount due for each of the months in the

period as follows:

| MONTH | AMOUNT |
|-------|--------|
| April 2006 | $ 4,096.00 |
| May 2006 | $ 4,372.00 |
| June 2006 | $ 3,840.00 |
| TOTAL | $ 12,308.00 |

$12,308.00 divided by three equals $4,102.67, which is used as the

estimated contribution amount due for each of the eleven months in the

period.  $4,102.67 times eleven equals $45,129.37 which is used as the

estimated contribution amount due to the Pension for the period of July

2006 through May 2007.

10.     Defendants owe interest through July 15, 2007 in the amount of $3,007.52 on the

unpaid pension contributions.  The interest has been calculated in accordance with the fluctuating

IRS interest rate, as provided at section 10 of the Plan.

11.     Section 10 of the Plan parallels the ERISA statute, 29 U.S.C. § 1132(g)(2), and

requires the assessment of liquidated damages against Defendants in an amount equal to the

greater of the following: the amount of interest owed on the delinquent principal, or twenty

percent (20%) of the delinquent principal. As noted above, the total interest owed through July

15, 2007 is $3,007.52.  Twenty percent (20%) of Defendants' unpaid contributions and

contributions paid past the due date total $11,306.62.  Since the total amount of liquidated

damages is greater than the interest amount, Defendants owe $11,306.62 in liquidated damages.

185629-1

12.     The Pension Fund routinely audits employers to ensure all required contributions are being paid. It also audits employers in connection with delinquency collection lawsuits. An audit is the most accurate tool employed by the Pension Fund to ensure an employer's compliance with its statutory obligations. In performing these audits, the auditor reviews the payroll records of each employee who performs work of the type covered by the collective bargaining agreement. These records will include time cards, payroll ledgers, payroll summaries, time slips, or such other payroll records as the employer maintains which will indicate the number of hours that each individual employee worked and was paid for each week. The information gathered from these records is then compared to the wage information found on the employer's federal, state and municipal tax returns and on the W-2 statements provided to the employees. The auditor also reviews disbursement ledgers and check registers to identify potential wage payments to employees not made through the payroll system. Job/project contracts are reviewed to determine whether the work performed is within the scope of the collective bargaining agreement. After compiling the information gathered from the above records, a schedule of the contributions that should have been paid according to the contract is prepared. This schedule, which is broken down by month, is then compared to the actual contributions which the employer did submit to the Pension Fund, with any differences noted. Once completed, an audit report is forwarded to the employer for its review and payment.

13.     Despite a continuing contractual obligation to do so, Defendants have repeatedly failed to submit timely remittance reports and pension contributions. The Pension Fund and its Trustees are required to pay benefits to all properly eligible employees of contributing employers. Employees of contributing employers continue to accrue pension credits, based on the hours of their employment, regardless of whether their employers make pension

contributions on their behalf for these hours, as contractually required. The Pension Fund's obligation to recognize pension credits and to pay pensions to vested employees is absolute and continues even if the employers fail to pay their required pension contributions. Employer contributions <u>and</u> the earnings the Pension Fund receives by investing these contributions comprise the assets from which the Pension Fund pays retirement benefits to participants and their dependents and beneficiaries. When employers, like Defendants, fail to pay their contributions or do not pay them timely, the Pension Fund is deprived of the investment income they otherwise could have earned. In addition, the Pension Fund also must engage in time-consuming and costly efforts to collect the unpaid contributions. These efforts include letters and phone calls to the employer, investigating other sources for collection and attempting to calculate delinquency amounts and benefit eligibility through other sources (e.g. paystubs), if available. Further, the Pension Fund has to process benefit eligibility and benefit claims manually so that participants (and their dependents) employed by the delinquent employer are not deprived of retirement benefits. The actual losses and added costs (in terms of dollar amount, capital and manpower) incurred by the Pension Fund in connection with an employer contribution delinquency are not capable of precise determination, but they are substantial. Defendants' refusal to contribute as it is bound means irreparable harm and injury to the Pension Fund – an obligation to make benefit payments to employees without necessary contributions from Defendants to cover those benefits. Therefore, Defendants should be required to submit timely current contributions and remittance reports in the future.

14.    I have executed this Declaration in support of Plaintiff's Motion for Default Judgment against Defendants and request that this Court consider the same as proof in support of

the allegations contained in the Plaintiff's Complaint and other facts stated in this Declaration.

Pursuant to 28 U.S.C. §1746, I declare under Penalty of perjury that the foregoing is true and correct.

Executed on: _____7/23/07_____

_Thomas Montemore_
THOMAS MONTEMORE



RECEIVED

JUN 2 6 2003

GEN PRESIDENT

June 1, 2003 Through May 31, 2008

# AGREEMENT

Between

## PAINTING & DECORATING CONTRACTORS ASSOCIATION, CHICAGO COUNCIL

And

## PAINTERS' DISTRICT COUNCIL NO. 14 OF THE INTERNATIONAL UNION OF PAINTERS & ALLIED TRADES

(of Chicago, Cook, Lake, Will, and Grundy Counties, Illinois)

**REPRODUCED COURTESY OF
THE CHICAGO PAINTING & DECORATING CONTRACTORS
INDUSTRY ADVANCEMENT & PROMOTIONAL FUND**



EXHIBIT

2

June 1, 2003 through May 31, 2008

A G R E E M E N T

between

PAINTING AND DECORATING CONTRACTORS ASSOCIATION, CHICAGO COUNCIL

and

PAINTERS' DISTRICT COUNCIL NO. 14
OF THE INTERNATIONAL UNION
OF PAINTERS AND ALLIED TRADES

(of Chicago, Cook, Lake, Will and Grundy Counties, Illinois)

April 24, 2003

# CONTENTS

|  | **Page** |
|---|---|
| ARTICLE I - OBJECTS | 8 |
| ARTICLE II - PARTIES | 8 |
| ARTICLE III - RECOGNITION | 9 |
| Section 1 - Bargaining Unit Defined | 9 |
| Section 2 - Recognition of Union | 9 |
| Section 3 - Recognition of Association | 9 |
| Section 4 - Shop Visits, Inspection of Records, and Stewards | 10 |
| Section 5 - Union membership Required, Reporting of New Employees | 10 |
| Section 6- Dues Check-Off | 11 |
| Section 7 - Voluntary Payroll Deduction of Political Contributions | 11 |
| Section 8 - Scope of Work | 12 |
| Section 9 - Work Outside Area | 13 |
| Section 10 - No Discrimination | 14 |
| ARTICLE IV - HOURS OF WORK -- HOLIDAYS | 14 |
| Section 1 - Normal Work Day | 14 |
| Section 2 - Overtime Rules | 14 |
| Section 3 - Wash-Up Time, Pay for Partial Days, and Show-up Time | 14 |
| Section 4 - Make-Up Day Rules | 14 |
| Section 5 - Holiday Observance | 15 |
| ARTICLE V - RATES OF PAY AND OVERTIME | 15 |
| Section 1 - Regular Rates | 15 |

Section 2 - Premium Pay ............................................................................................ 16

Section 3 - Industrial Work ........................................................................................ 16

ARTICLE VI - HEALTH AND WELFARE FUND ........................................................ 17

Section 1 - Required Contributions ........................................................................... 17

Section 2 - Trust Agreement ...................................................................................... 19

Section 3 - Information for Trustees --Audits and Collections ................................. 19

Section 4 - Violation of Agreement ........................................................................... 20

ARTICLE VII - PENSION FUND ................................................................................. 20

Section 1 - Required Contributions ........................................................................... 20

Section 2 - Trust Agreement ...................................................................................... 22

Section 3 - Information for Trustees --Audits and Collections ................................. 23

Section 4 - Violation of Agreement ........................................................................... 24

ARTICLE VIII - DEFERRED SAVINGS PLAN FUND ............................................... 24

Section 1 - Required Deductions ............................................................................... 24

Section 2 - Trust Agreement ...................................................................................... 26

Section 3 - Information for Trustees -- Audits and Collections ................................ 27

Section 4 - Violation of Agreement ........................................................................... 28

ARTICLE IX - WORKING TOOLS .............................................................................. 28

Section 1 - Brushes .................................................................................................... 28

Section 2- Spray Painting - Oil Paints ...................................................................... 28

Section 3 - Spray Painting - Water Thinned Materials ............................................. 28

Section 4 - Protective Equipment .............................................................................. 28

Section 5 - Roller Applicators ................................................................................ 29

Section 6 - Mitten Applicators ............................................................................... 30

Section 7 - Dipping .............................................................................................. 30

Section 8 - Tools Issued to Employees .................................................................. 30

ARTICLE X - WORKING CONDITIONS ................................................................ 30

Section 1 - No Abuse of Employees ...................................................................... 30

Section 2 - Dangerous Materials ........................................................................... 30

Section 3 - Wash-Up and Clothes Storage ............................................................ 30

Section 4 - Time Sheets ........................................................................................ 30

Section 5 - Weight Limits ...................................................................................... 31

Section 6 - Other Conditions ................................................................................. 31

     (a)     Drop Cloths ................................................................ 31
     (b)     Jacks and Ladders .................................................... 31
     (c)     Stringers & Scaffolding ........................................... 31
     (d)     Stilts & Scaffold Substitutes .................................. 31
     (e)     Elevators & Elevator Shafts .................................. 31
     (f)     Gloves ...................................................................... 31
     (g)     Metal Extension Ladders ........................................ 31
     (h)     Inspection of Equipment ......................................... 31
     (i)     Evening Shop Time .................................................. 31

Section 7 - Travel Outside Jurisdiction ................................................................. 32

Section 8 - Specifications ...................................................................................... 32

Section 9 - Swinging Scaffolds .............................................................................. 32

Section 10 - Compliance with Legal Requirements ............................................... 32

Section 11 - Injuries On the Job ............................................................................ 33

Section 12 - Uniforms ........................................................................................... 33



ARTICLE XI - MISCELLANEOUS PROVISIONS RELATIVE TO WORK ..................... 33

    Section 1 - Subcontracting to Employees Prohibited ................................................. 33

    Section 2 - Subcontracting to Others and Application of Contract ........................... 34

    Section 3 - Strikes ................................................................................................... 34

    Section 4 - Joint Trade Board ................................................................................. 35

    Section 5 - Painting Departments ........................................................................... 35

    Section 6 - Runaway Shops Prohibited ................................................................... 35

    Section 7 - Picket Lines ........................................................................................... 35

ARTICLE XII - PAY DAY -- NOTICES TO UNION --
        EMPLOYMENT ................................................................................. 35

    Section 1 - Weekly Pay Day ................................................................................... 35

    Section 2 - Payment Upon Discharge ..................................................................... 36

    Section 3 - Shop Painting of Trim .......................................................................... 36

    Section 4 - Reporting All Jobs to Union ................................................................. 36

    Section 5 B Noncompliance with Reporting Requirements ..................................... 36

ARTICLE XIII - APPRENTICES AND APPRENTICESHIP FUND ................................. 36

    Section 1 - Required Contributions ......................................................................... 36

    Section 2 - Trust Agreement ................................................................................... 38

    Section 3 - Information of Trustees -- Audits and Collections ................................. 38

    Section 4 - Violation of Agreement ........................................................................ 39

    Section 5 - Apprenticeship Rules ............................................................................ 39

    Section 6 - Selection and Indenture Apprentices .................................................... 40

    Section 7 - Employment of Apprentices ................................................................. 40

Section 8 - Apprentices Work with Journeymen ................................................. 40

Section 9 - Trade School Attendance Required ................................................. 40

Section 10 - Apprenticeship Fees ................................................. 41

Section 11 - Wages of Apprentices ................................................. 41

ARTICLE XIV - IUPAT JATF ................................................. 42

ARTICLE XV - INSURANCE, TAXES AND SURETY BOND ................................................. 43

Section 1 - Workers Compensation and Occupational Diseases
Coverage -- Wage and Fringe Benefit Bond ................................................. 43

Section 2 - Unemployment Compensation Act Coverage ................................................. 45

Section 3 - Wage and Withholding Statements ................................................. 45

Section 4 - Fringe Benefit Stamp ................................................. 45

ARTICLE XVI - JOINT TRADE BOARD ................................................. 45

Section 1 - Designation of Members -- Board Rules ................................................. 45

Section 2 - Jurisdiction ................................................. 45

Section 3 - Board Decisions Final and Binding ................................................. 46

Section 4 - Hearing Expenses ................................................. 46

ARTICLE XVII - COOPERATION TRUST ................................................. 46

ARTICLE XVIII - LMCI ................................................. 47

ARTICLE XIX - INDUSTRY ADVANCEMENT FUND ................................................. 48

ARTICLE XX - EXECUTION OF AND RESPONSIBILITY UNDER AGREEMENT
-- RECORDS ................................................. 49

Section 1 - Acts of Individual Members ................................................. 49

Section 2 - Association Roster ................................................. 49

Section 3 - Printing of Agreement ............................................................................... 49

Section 4 - Association Files .......................................................................................... 49

Section 5 - Referral of Journeymen ............................................................................. 49

ARTICLE XXI - MOST FAVORED NATIONS CLAUSE ........................................... 50

ARTICLE XXII - PAINTERS EDUCATION & SCHOLARSHIP FUND ...................... 50

ARTICLE XXIII - ALCOHOL AND SUBSTANCE ABUSE ........................................ 50

ARTICLE XXIV - DURATION OF AGREEMENT ....................................................... 56

# AGREEMENT

## ARTICLE I

## OBJECTS

The objects of this Agreement, and the aims and intentions which all parties are desirous of attaining are:

(a)    To effectuate a spirit of fair dealing between Employer and Employee in the Painting Industry in the City of Chicago, Cook, Lake, Will and Grundy Counties, Illinois, and whatever additional jurisdiction may be awarded the Union.

(b)    To establish a high order of efficiency in said Industry by intelligent cooperation of Employer and Employee.

(c)    To, so far as reasonably possible, eliminate strikes, lockouts, and interferences with work, with their attendant inconvenience to the public, and loss and waste to the parties involved, by the substitution in their stead of a peaceable and orderly machinery for the handling of all disputes which may arise in the Industry between Employer and Employee.

(d)    To raise the standards of the Painting Industry in the City of Chicago, Cook, Lake, Will and Grundy Counties, Illinois, and in whatever additional jurisdiction as may hereafter be awarded to the Union, so that it may command the respect and increased patronage by the public by giving it the highest quality of work at fair and reasonable prices.

## ARTICLE II

## PARTIES

Whenever the word "Association" is used herein, it shall mean the PAINTING AND DECORATING CONTRACTORS' ASSOCIATION, CHICAGO COUNCIL, an Illinois not-for-profit corporation, and all of its members individually and collectively, whether now belonging to said Association or who may hereafter be admitted to membership.  The members of said Association [and any other employer who is not a member of the Association but is otherwise bound by this Agreement] being sometimes hereinafter referred to as "Employer."

Whenever the word "Union" is used herein, it shall mean the PAINTERS' DISTRICT COUNCIL NO. 14 and all of the local unions affiliated therewith and all of the members thereof, individually and collectively bound hereafter, whether now members of said local unions or who may hereafter become members of said unions.  The members of said unions being sometimes referred to hereinafter as "Employees."

## ARTICLE III

### RECOGNITION -- UNION SHOP

**Section 1. Bargaining Unit Defined.**     The Association and the Union recognize and agree that the unit for collective bargaining, hereinafter referred to as the "Bargaining Unit," is:

>All journeymen, apprentice and painters, decorators, paperhangers, drywall tapers and applicators using tools of the trade to apply or remove materials used for or preparatory to decorating or protecting surfaces, who are employed to do such work by the present and future Employer members of the Association in that area of Chicago, Cook, Lake, Will and Grundy Counties, Illinois, and whatever additional jurisdiction may be awarded the Union, and such other work over which the Union may hereafter acquire jurisdiction.

**Section 2. Recognition of Union.** The Association and the employers it represents in bargaining recognize the Union as the sole and exclusive bargaining agent for a unit of employees appropriate for bargaining within Section 9(a) of the National Labor Relations Act. The Association and the employers it represents in bargaining agree that this recognition is predicated on a clear showing of majority support indicated by bargaining unit employees without the need for a National Labor Relations Board certified election under Sections 9(a) and (c) of the Act.

**Section 3. Recognition of Association.**     (a) The Union recognizes the Association as the sole and exclusive bargaining agent of the Employer members of the Association and of such other Employers as may become members of the Association or agree to be bound by the terms of the Association agreement, as to all matters concerning Employees in the Bargaining Unit.

(b)     The Association has been designated as the sole and exclusive bargaining agent of its Employer members and agrees to produce evidence requested by the Union to confirm this authority, including its Constitution, By-Laws, and applications for members.

(c)     The Association shall notify the Union of each additional individual signing up in writing within twenty-four (24) hours following the approval of the application for membership in the Association. Any individual Employer who seeks to withdraw membership in the Association must notify the Union and the Trust Funds in writing and remain bound to the collective bargaining agreement as amended thereafter in future negotiations with the Association unless timely notice is given.

(d)     The Association and all Employer signatory to this Agreement, agree to be stipulated to the JOINT CONFERENCE BOARD of the "CONSTRUCTION EMPLOYERS ASSOCIATION", and "THE CHICAGO AND COOK COUNTY BUILDING AND CONSTRUCTION TRADES COUNCIL", regarding the settlement of all jurisdictional disputes.

**Section 4.  Shop Visits, Inspection of Records, and Stewards.**    (a)    Each Employer covered by this Agreement agrees to recognize and deal, in his shop at reasonable hours of the day, with such representatives as the Union may elect or appoint.  Each Employer further agrees to permit duly accredited representatives of the Union to visit his shop and offices at any reasonable time during working hours for the purpose of inspecting lists of Employees, payroll records, and time cards in order to determine whether the shop is being conducted in accordance with this Agreement. The employer shall permit the visits within twenty-four (24) hours after receiving the Union's request.

(b)    Business representatives of the Union shall appoint shop and job stewards from among men employed in shop or on jobs except in those cases where the Board of Business Representatives, with concurrence of the Union, recommends the appointment of other than those in shop or on jobs.  Where a steward is appointed from outside the Employer's workforce, he shall immediately be placed on the job.

(c)    Stewards appointed by the Union in shops or on jobs shall (unless proper cause for discharge exists) be retained in such shop or on such job until all Employees other than the foreman have been dismissed or re-assigned.

**Section 5.  Union Membership Required, Reporting of New Employees**    (a)  All new employees shall be required to become a member of the Union after the expiration of seven (7) days after the day of their employment, or seven (7) days after the date of the execution of this Agreement, whichever is later, and shall remain members of the Union in good standing as a condition of employment.

1.    Employees covered by this Agreement at the time it is signed and who are members of the Union at that time shall be required, as a condition of continued employment, to continue membership in the Union in good standing for the duration of this Agreement.

2.    Employees covered by this Agreement at the time it has been signed, and who are not members of the Union at that time, shall be required to join the Union seven (7) days after the date of execution of this Agreement and remain members of the Union in good standing.

3.    Good standing shall mean the tender of administrative fees and dues uniformly required as a condition of acquiring or retaining membership.

(b)    All Employers shall, prior to the completion of the first pay period, but no later than seventy-two (72) hours after a new employee is hired, submit a list of all new employees to the Union, in writing upon a form provided by the Union which shall include employee's name, date employed, address, telephone number, and Social Security number.  Failure to notify the Union may result in the Union withholding men.

(c)    Where an Employer is notified to terminate Employees by reason of their failure to tender administrative fees or periodic dues, then the letters from the Union to said employee and a letter to the Employer requesting such discharge, will be made available to the Employer upon request.

**Section 6.**    **Dues Check-off.** (a) Every Employer signatory to this Agreement hereby agrees to check-off from wages of any employee employed by such Employer during the term of this Agreement dues in the amount specified in the Union's bylaws and to remit said amount to the Union in the following manner:

      1.    The Union will notify the Employer in writing of the amount of dues specified in the bylaws, and will submit to the Employer a copy of the bylaws or the applicable bylaw provision.

      2.    On or before the 20th day of each month, the Employer will remit to the Union the amount of dues owing as to each employee for the month previous, together with a list of employees covered hereby.

      (b)    The obligations of the Employer under this Section 6 shall apply only to those employees who have voluntarily signed a valid dues deduction authorization card.

      (c)    At the time of the employment of any employee, the Employer will submit to each such employee for his voluntary signature a dues deduction authorization card in triplicate, one copy of which is retained by the Employer, one copy retained by the employee, and the other returned to the Union, the form to be supplied such Employer by the Union.

      (d)    On or before the 20th day of each month, the Employer will submit to the Union a list of all employees covered by the Agreement who have not signed a dues deduction authorization card.

      (e)    The Union agrees that it will indemnify and hold harmless the Employer from any and all claims, suits, causes of action, or otherwise, as regards the creation and administration of the dues check-off established by this Article and such indemnity and agreement to hold harmless shall include the payment of costs and attorneys fees on behalf of the beneficiaries of such indemnity.

**Section 7.**    **Voluntary Payroll Deduction of Political Contributions.**

      (a)    Commencing June 1, 2003 and for the life of the agreement the Employer shall honor authorizations for check off of political contributions deductions from wages of Employees employed by such employer during the term of this agreement in the amount of five cents (5¢) per hour worked to the Painters District Council No. 14 Illinois Political Committee (LPC) and to forward all contributions deducted in the employees name and reports on contributions on or before the 20th day of each month for the previous work month to Painters LPC Fund.

(b)　　The obligations of the Employer under this Section 7 shall apply only to those employees who have voluntarily signed a valid political contributions check off deduction authorization card.

(c)　　At the time of the employment of any employee, the Employer will submit to each such employee for his voluntary signature a political contributions check off deduction authorization card in triplicate, one copy of which is retained by the Employer, one copy retained by the employee, and the other returned to the Union, on the form to be supplied such Employer by the Union.

(d)　　On or before the 20th day of each month, the Employer will submit to the Union a list of all employees covered by the Agreement who have not signed a political contributions check off deduction authorization card.

(e)　　The Union agrees that it will indemnify and hold harmless the Employer from any and all claims, suits, causes of action, or otherwise, as regards the creation and administration of the political contributions check off deduction program established by this Section 7 and such indemnity and agreement to hold harmless shall include the payment of costs and attorneys fees on behalf of the beneficiaries of such indemnity.

**Section 8.  Scope of Work.**  The work done by employees in the bargaining unit, or any other person shall include, but shall not be limited to, the following:

(a)　　All work regarding the use, application, cleaning, washing, bleaching, or removal of paints, pigments, binders, extenders, thinners, dryers, primers, sealers, oil paints, enamels, chemical and epoxy coatings, water colors, emulsions, clear coatings, waxes, stains, oils, varnishes, mastics, plastics, urethanes, Adhesives, foams, seamless and tile-like coatings, cement enamels and other special coatings, sheet, rubber and other linings, protective or decorative ceiling or wall coverings (including, but not limited to, carpeting and soft wall materials), and decorative textures on all surfaces lead paint removal and abatement of toxic substances, coatings and coverings.

(b)　　The application of all materials, regardless of trade name markings or method, to all ceilings, interior or exterior walls, floors, roofs, foundations, windows, doors, frames, screens, building trim (wood or metal), streets sidewalks, fire escapes, pipes and pipe coverings, radiators, light poles, power and any other type of tower, tanks, vats, pavement, parking lots, guard rails, bridges, or any other surfaces or structures for the purpose of decoration, washing, cleaning, identification, or protection, including fireproofing, damp proofing, water proofing, insulation, or rust preventions.

(c)　　All preparatory and ancillary work necessary in connection with the above, including the taping, patching, sanding, washing, cleaning and priming of surfaces, the spreading of dropcloths or protective covers, the set-up and operation of rigging and scaffolding owned by the Employer, and the operating of all tools and equipment used by the Trade including, but not limited to, brushes, rollers, spray painting equipment, and miscellaneous hand and power driven tools, including

sandblasting and waterblasting equipment and the operation and manning of compressors and generators used to power said tools and any other trade related equipment.

**Section 9.   Work Outside Area**.  (a) It being understood that the principal place of business and employment of the present and future Employer members of the Association is in the Metropolitan Chicago Area and Cook, Lake, Will and Grundy Counties, Illinois, but that such Employers, on occasions, undertake work performed by the journeymen and apprentice painters, decorators, paper hangers, drywall tapers, and applicators using tools of the trade to apply or remove materials used for or preparatory to decorating or protecting surfaces, in other cities and areas, on which occasions such Employers employ such additional Employee residents of such other city or area as the needs of the work require.

(b)    This Agreement shall embrace and PAINTERS' DISTRICT COUNCIL NO. 14 shall be the exclusive bargaining representative for and on behalf of all the Employees described herein who are employed by such Employer wherever and whenever employed during the term of this Agreement except supervisory employees and other Employees excluded under the provisions of the National Labor Relations Act as amended.

(c)    Provided, however, that when the above Employer or contractor is engaged in work outside the geographical jurisdiction of the Union party to this Agreement, he shall employ not less than 50 percent of the men employed on such work from among the residents of the area where the work is performed or from among persons who are employed the greater percentage of their time in such area.  Any others shall be employed from the contractor's home area.

(d)    And provided further that the Employer, when engaged in work outside the geographical jurisdiction of the Union party to the Agreement shall comply with all of the lawful clauses of the Collective Bargaining Agreement in effect in said or other geographical jurisdiction and executed by the Employers of the Industry and the local unions in that jurisdiction, including, but not limited to, the provisions of wages, hours, working conditions, and all fringe benefits therein provided, including all provisions relating to the settlement of grievances, provided, however, that as to Employees employed by such Employer within the geographic jurisdiction of the Union party to this Agreement and who are brought into an outside jurisdiction, such Employees shall be entitled to receive the wages and conditions effective in either the home or outside jurisdiction, whichever are more favorable to such Employees.

(e)    Provided further that this Section 9 shall not be effective unless or until the Union or Council domiciled in the area outside the geographical jurisdiction of the Union party to this Agreement has in its Collective Bargaining Agreement a provision similar in substance to that contained in this section.

(f)    The Union agrees that it will use its best efforts to achieve compliance with the terms of such similar provisions in the contracts of union contractors from other geographic jurisdictions who are performing work in this Union's geographical jurisdiction.

-13-

**Section 10.  No Discrimination.**    There shall be no priority given with reference to opportunities for employment to any person because of membership in the Union or non-membership in the Union, nor shall there be any discrimination made because of race, color, creed, age, sex, or national origin of the applicant.

## ARTICLE IV

## HOURS OF WORK -- HOLIDAYS

**Section 1. Normal Work Day.**    The normal work day shall be eight (8) hours, excluding one-half (1/2) hour for lunch, between the hours of 8:00 a.m. and 4:30 p.m.  The normal work week shall be Monday through Friday.  The regular workday described above may be adjusted so that starting time will begin no earlier than 7:00 a.m. provided that eight (8) hours constitutes a normal work day.  In such event, the Employer must notify PAINTERS DISTRICT COUNCIL NO. 14 prior to effecting the adjusted work day schedule.

**Section 2.  Overtime Rules.**    Employees shall not work more than eight (8) hours in twenty-four (24) hours without Union approval on the legal holidays of New Years' Day, Memorial Day, Fourth of July, Thanksgiving Day, and Christmas Day.  When work is to be performed outside the normal work day as stated in Section 1 of this Article or on Saturdays or Sundays, a permit stating the number of men must be approved by the office of the Union. No work shall be done on Labor Day.

**Section 3.  Wash-Up Time, Pay for Partial Days, and Show-up Time.**  (a) There shall be an allowance of ten (10) minutes for wash-up time in each one-half (1/2) day's work.  Any Employee going to work and reporting to Employer's shop between 7:45 a.m. and 8:00 a.m. shall stand no loss of time, if unable to get to the job by 8:00 a.m. on account of distance or accident. Where an Employee works a fractional part of a day, he shall be paid for no less than one-half (1/2) day's work, except in cases where an Employee is discharged for drunkenness, gross incompetence, or where he quits voluntarily or where weather conditions prevent a continuation of his employment. If inclement weather prevents an Employee from working at an assigned job site, he shall be paid two (2) hours at the prevailing wage scale.  Where practical, he shall contact his shop to confirm assignment to the job on that date.

(b)    Separate and apart from wash up time, Employees shall be given a 10 minute paid break in the morning and a 10 minute paid break in the afternoon.

**Section 4.  Make-Up Day Rules.**  Effective June 1, 2003, during the months of April through November in the years June 1, 2003 through May 31, 2008, the Employer may have a make-up day, at regular pay, for exterior work on buildings or dwellings lost due to rain or snow.  In order to utilize this make-up day privilege, each of the following conditions must be met:

1.    Make-up days shall be voluntary for the Employee.  The men who lost the work due to inclement weather shall be given the first opportunity to work the make-up day.

2.      All make-up days must be reported to the Union.  If they are not reported, normal overtime must be paid.

3.      Road, bridge and interior work is not included.

4.      No make-up day may be scheduled unless the affected Employees lost a full day of work.  If the work was lost under circumstances entitling the Employee to show-up pay or if it was canceled after the Employee began work, this make-up day provision shall not apply.

5.      This make-up day provision shall in no way affect the Employee's right to premium pay for hours worked in excess of eight (8) in a work day or forty (40) in a work week, nor shall it affect the Employee's right to premium pay for "off hours" work.

Section 5.  Holiday Observance.    Where any of the legal holidays mentioned in Section 2 of this Article fall on Sunday, the following Monday shall be recognized as the holiday, and when they fall on Saturday, the preceding Friday shall be recognized as the holiday.

## ARTICLE V

## RATES OF PAY AND OVERTIME

Section 1.  Regular Rates  (a)  The regular wage rate per hour for journeyman shall be as follows:

| | |
|---|---|
| **The rate presently in effect for the period June 1, 2002 through May 31, 2003 is:** | **$29.85 per hour.** |
| **Effective June 1, 2003 through May 31, 2004:** the total economic adjustment package, to be allocated between wages and benefits by the Union in its sole discretion  provided at least 25¢ per hour must be allocated to the Welfare Fund, shall be increased by: | **$2.00 per hour** |
| **Effective June 1, 2004 through May 31, 2005:** the total economic adjustment package, to be allocated between wages and benefits by the Union in its sole discretion, shall be increased by: | **$2.10 per hour** |



Effective June 1, 2005 through May 31,
2006: the total economic adjustment package,
to be allocated between wages and benefits by
the Union in its sole discretion, shall be
increased by:

$2.20 per hour

Effective June 1, 2006 through May 31,
2007: the total economic adjustment package,
to be allocated between wages and benefits by
the Union in its sole discretion, shall be
increased by:

$2.30 per hour

Effective June 1, 2007 through May 31,
2008: the total economic adjustment package,
to be allocated between wages and benefits by
the Union in its sole discretion, shall be
increased by:

$2.40 per hour

(b)   General foremen shall be paid two (2) extra hours per day; foremen shall be paid one (1) extra hour per day; sub-foreman shall be paid one-half (1/2) extra hour per day. A foreman or sub-foreman may or may not be appointed when there are four (4) or more men involved, and the appointment of a foreman or a sub-foreman shall be at the sole discretion of the Employer; any journeyman or third-year apprentice shall be paid at the foreman's rate for each day that he is responsible for the performance of work by four (4) or more employees, or the layout of such work, defined in this Agreement.

Section 2.  Premium Pay.    Time and a half of regular rates shall be paid Employees:

(a) for all hours worked in excess of the eight (8) hours [excluding one-half (1/2) hour lunch period] of the normal work day (8:00 a.m. through 4:30 p.m., subject to the provisions of Article IV, Section 1) in the normal work week (Monday through Friday);

(b) for all hours worked outside of the hours of the normal work day (8:00 a.m. through 4:30 p.m., subject to the provisions of Article IV, Section 1) in the normal work week (Monday through Friday); and

(c)  all hours worked outside the normal work week of Monday through Friday or on the legal holidays specified in Sections 2 and 4 of Article IV except as provided in Section 3 below.

Section 3.  Industrial Work.  All work performed in industrial facilities outside the normal working hours may be done at the rate of Twenty percent (20%) over the regular hourly rates. Separate office buildings on the site of the industrial facility may be painted under this provision provided that the contract for the work to be performed includes work in other parts of the facility. The aforesaid scale of wages shall apply from 4:30 p.m. Monday to 2:30 a.m. Saturday. The pay

-16-



rate for this work shall not be applied in excess of eight (8) hours per day. The industrial rates shall not apply to new construction. Failure to report this work to the Union will require full premium pay.

**ARTICLE VI**

**HEALTH AND WELFARE FUND**

**Section 1:    Required Contributions.** (a) (i) The Employers agree to make welfare contributions for each hour worked by each Employee covered by this Agreement in addition to the wages herein stipulated, said amounts may hereafter be amended in future bargaining as required to maintain the current level of benefits. The rate presently in effect for the period June 1, 2002 until May 31, 2003 is $4.30 per hour for each hour worked by each Employee covered by this agreement in addition to the wages herein stipulated.

From **June 1, 2003 until May 31, 2004** each Employer shall contribute $4.30 per hour for each hour worked by each Employee covered by this agreement plus such additional amount as the Union chooses to allocate from its June 1, 2003 total economic adjustment package, which amount shall not be less than 25¢.

From **June 1, 2004 until May 31, 2005** each Employer shall contribute the amount per hour from the June 1, 2003 - May 31, 2004 contract year, plus such additional amount as the Union chooses to allocate from its June 1, 2004 total economic adjustment package.

From **June 1, 2005 until May 31, 2006** each Employer shall contribute the amount per hour from the June 1, 2004 - May 31, 2005 contract year, plus such additional amount as the Union chooses to allocate from its June 1, 2005 total  economic adjustment package.

From **June 1, 2006 until May 31, 2007** each Employer shall contribute the amount per hour from the June 1, 2005 - May 31, 2006 contract year, plus such additional amount as the Union chooses to allocate from its June 1, 2006 total  economic adjustment package.

From **June 1, 2007 until May 31, 2008** each Employer shall contribute the amount per hour from the June 1, 2006 - May 31, 2007 contract year, plus such additional amount as the Union chooses to allocate from its June 1, 2007 total economic adjustment package.

Such contributions shall be made to the Chicago Painters and Decorators Welfare Fund, hereafter referred to as the "Welfare Fund."

The Union commits to allocate to the Welfare Fund from its total economic package during the life of this contract such amounts as are required to maintain current benefits, as calculated by the Welfare Fund consultants, before any distribution is made to the wage allocation from the total economic adjustment package.

-17-

(a) (ii) The Employer shall make contributions on behalf of each of its Employees employed by Employer in a management or supervisory position who are also engaged in work of a character falling within the jurisdiction covered by this Collective Bargaining Agreement in an amount of no less than One Hundred Sixty (160) hours per month. Each such Employer shall execute a Participation Agreement with the Trustees of the Welfare Fund, upon the request of such Trustees, for such greater or lesser amounts of hours as the Trustees may deem appropriate.

(a) (iii) The Employer shall make contributions on behalf of superintendents, estimators, and other management personnel for whom contributions to the Welfare Fund were heretofore made when such individuals were employed as journeymen painters. If an Employer elects to bring his superintendents, estimators or other management personnel into the Fund under this agreement, all such Employees of that Employer shall be enrolled, and such Employer's election may not be changed until the end of this contract or the expiration of three years, whichever occurs later. Such contributions shall be made in a monthly amount no less than One Hundred Sixty (160) times the hourly contribution rate specified in this Article.

(b) (i) The PAINTERS' DISTRICT COUNCIL NO. 14 may elect to come under and contribute to the Welfare Fund at the same rate as the Employers for those full-time Employees of the Council and of its affiliated local unions who are or who have heretofore been qualified journeymen painters. Each local union affiliated with PAINTERS' DISTRICT COUNCIL NO. 14 may elect to come under and contribute to the Welfare Fund at the same rate as the Association members for those of its full-time Employees who are or who have heretofore been qualified journeymen painters.

(b) (ii) The Chicago Painters' Joint Apprenticeship and Building Fund and the Trustees of the Chicago Painters and Decorators Welfare Fund may make contributions for their full-time Employees.

(b) (iii) The Chicago Drywall Finisher's Joint Apprenticeship, Training, and Building Fund may contribute for its full-time Employees.

(c) Effective January 1, 2001, the current welfare contribution rate per hour or the amount as amended in future bargaining shall be paid to the Welfare Fund no later than the twentieth (20th) day of the month after the work was performed. The first report and contribution in a calendar year not received during this grace period shall be assessed liquidated damages amounting to 10 percent of the amount of the contributions which are owing. All other late contributions and reports in the same calendar year will be assessed 15% of the amount of contributions owed as liquidated damages. The Employer acknowledges that the liquidated damages shall be used to defer administrative costs arising by said delinquency and acknowledges the costs to be actual and substantial although difficult to ascertain. However the Employer acknowledges these costs to be at a minimum of 15 percent, waiving the necessity of any additional proof thereon. In addition, delinquent contributions shall bear interest at the prime rate established as of the date of the delinquency by Bank One, Chicago from the due date until they are paid. In the event of a conflict between the Trust Agreement and the bargaining agreement, those terms most favorable to the Trust shall prevail.

(d) The contributions set forth above shall be made to the Welfare Fund for each hour worked by each Employee covered by this Agreement, regardless of the geographic location of the job, unless payment was made to an applicable fund to the geographic area where the work was performed. In no case shall a double payment be required.

**Section 2.  Trust Agreement.**        (a) Each Employer party to this Agreement agrees to pay the sums specified above to the Welfare Fund for the purpose of providing health and welfare benefits to each eligible Employee. It is expressly understood and agreed that the Agreement and Declaration of Trust, together with all amendments, rules, regulations, policies, and procedures adopted pursuant thereto, are incorporated herein by reference and made a part hereof and that all Employers party to the Collective Bargaining Agreement agree to become or remain bound by and to be considered a party to said Agreement and Declaration of Trust as if said Employers had signed the original copies of the aforementioned Trust instruments and all amendments thereto. All Employers party to this Agreement hereby ratify and confirm the appointment of the Employer Trustees of said Trust, who shall, together with their successor Trustees designated in the manner provided in said Agreement and Declaration of Trust, and jointly with an equal number of Trustees appointed by the Union, carry out the terms and conditions of the Trust Agreement.

(b) The Association has designated three (3) Trustees as Employer Representatives. The Union has designated three (3) Trustees as Employee Representatives. The Agreement and Declaration of Trust provides the terms of the Trustees and the terms of all future Trustees; and that whenever a Trustee's term expires or a vacancy in any trusteeship occurs or exists, the Association shall choose or designate the person to fill such Employer trusteeship and the Union shall choose or designate the person to fill such Employee trusteeship.

**Section 3.  Information for Trustees—Audits and Collections.** (a) Each Employer shall furnish the Trustees with information such as the names of all subcontractors and all Employees, classifications, Social Security numbers, wages and/or hours worked, and such other information as may be required for the proper and efficient administration of the Welfare Fund. Effective June 1, 2003 and thereafter each Employer shall be required to obtain and maintain for a period of seven (7) years weekly time sheets completed, signed and dated by each covered employee for all hours worked.

(b) The Union and/or the Trustees of the Welfare Fund shall have the authority to audit the books and records of a participating Employer, either directly or through their authorized representative, whenever such examination is, in their sole discretion, deemed necessary for the purpose of determining compliance with the provisions of this Agreement. Each participating Employer shall make its books and records available to the Trustees for such purpose. Such books and records shall include but not be limited to, all cash disbursement journals, payroll records, time

records, or any other documents which form the basis of individual payroll records, state unemployment compensation returns, union pension, welfare, apprentice, and deferred savings records to other funds, and all other relevant records which would show payment of wages or fringe benefits. The information supplied by the Employer shall remain confidential and shall be used solely to determine or establish whether or not proper wages and contributions have been made. In the event the audit discloses that the Employer, during the period of the audit, has underpaid its contributions and/or wages, the Employer shall be liable for the costs of the examination, including but not limited to, audit fees and reasonable attorneys' fees. The Trustees' authority to waive any costs shall be governed by the terms of the Trust Agreement. The Union shall not be bound beyond the terms of its Constitution and By-Laws.

(c)    If any Employer has employed a person or entity in violation of Article XI, Section 1 and 2 of this Agreement, the number of hours with respect to which such Employer owes benefit contributions shall be computed by dividing the total dollar amount paid to such Employee as compensation for the work involved by the actual hourly wage rate paid. In any instance where this contract is violated by the use of piecework rather than hours of work as the basis of payment, the compensation actually received by the Employee will be divided by fifty percent (50%) of the contractual hourly wage rate in order to better approximate the number of hours actually worked. The number of hours so determined shall be presumed to be the number of hours upon which benefit contributions are owed with respect to such Employee. The Employer shall receive credit for all material expenses that can be established.

(d) In the event the Trustees place a delinquent Employer's account in the hands of legal counsel for collection, the Employer shall be liable for reasonable attorneys' fees and for all reasonable costs incurred in the collection process, including court fees, audit fees, etc. Reasonable attorneys' fees shall mean: All reasonable attorneys' fees in the amounts which the Trustees become legally bound to pay, including fees incurred for the recovery of liquidated damages, interest, audit costs, filing fees, and any other expenses incurred by the Trustees.

**Section 4. Violation of Agreement.**   Failure of any Employer after reasonable notice by the Trustees so to do, to furnish books and records, reports, pay contributions, or comply with the rules and regulations formulated and promulgated by the Trustees of the Welfare Fund, shall be considered a violation of the terms and conditions of this Collective Bargaining Agreement.

## ARTICLE VII

### PENSION FUND

**Section 1. Required Contributions.**  (a)  (i)  The Employers agree to make pension contributions for each hour worked by each Employee covered by this Agreement in addition to the wages herein stipulated, said amounts may hereafter be amended in future bargaining:

The current rate in effect for the period June 1, 2002 to
May 31, 2003 is:  Four and 30/100 Dollars ($4.30) per hour;

That for each hour worked by each employee covered under this agreement 25 cents per hour of the above pension contribution shall be paid towards a percentage of contribution plan whereby the monthly accrued benefit payable at regular retirement age is determined by taking the multiplier times the amount of a participant's total contributions during his years of plan participation.

From June 1, 2003 until May 31, 2004 the Employers shall contribute $4.30 per hour plus such additional amount as the Union chooses to allocate from its June 1, 2003 total economic adjustment package.

From June 1, 2004 until May 31, 2005 the Employers shall contribute the amount payable for the June 1, 2003 -- May 31, 2004 contract year plus such additional amount as the Union chooses to allocate from its June 1, 2004 total economic adjustment package.

From June 1, 2005 until May 31, 2006 the Employers shall contribute the amount payable for the June 1, 2004 -- May 31, 2005 contract year plus such additional amount as the Union chooses to allocate from its June 1, 2005 total economic adjustment package.

From June 1, 2006 until May 31, 2007 the Employers shall contribute the amount payable for the June 1, 2005 -- May 31, 2006 contract year plus such additional amount as the Union chooses to allocate from its June 1, 2006 total economic adjustment package.

From June 1, 2007 until May 31, 2008 the Employers shall contribute the amount payable for the June 1, 2006 -- May 31, 2007 contract year plus such additional amount as the Union chooses to allocate from its June 1, 2007 total economic adjustment package.

Such contributions shall be made to the Chicago Painters and Decorators Pension Fund, hereafter referred to as the "Pension Fund."

Such amount will be no less than the amount calculated by the Pension Fund consultant as required to maintain the current level of benefits before any distribution is made to the wage allocation from the total economic adjustment package for that year.

(a)  (ii)  The Employer shall make contributions on behalf of each of its Employees employed by Employer in a management or supervisory position who are also engaged in work of a character falling within the jurisdiction covered by this Collective Bargaining Agreement in an amount of no less than One Hundred Sixty (160) hours per month.  Each such Employer shall execute a Participation Agreement with the Trustees of the Pension Fund, upon the request of such Trustees, for such greater or lesser amounts of hours as the Trustees may deem appropriate.

(a)  (iii)  The Employer may make contributions on behalf of Superintendents, estimators, and other management personnel for whom contributions to the Pension Fund were heretofore made

when such individuals were employed as journeymen painters. If an Employer elects to bring his superintendents, estimators or other management personnel into the Fund under this agreement, all such employees of that Employer shall be enrolled, and such Employer's election may not be changed until the end of this contract or the expiration of three years, whichever occurs later. Such contributions shall be made in a monthly amount no less than One Hundred Sixty (160) times the hourly contribution rate specified in this Article.

(b)  (i)  The PAINTERS' DISTRICT COUNCIL NO. 14 may elect to come under and contribute to the Pension Fund at the same rate as an Employer for those full-time Employees who have heretofore been qualified journeymen painters. Each local union affiliated with the PAINTERS' DISTRICT COUNCIL NO. 14 may elect to come under and contribute to the Pension Fund at the same rate as an Employer for those of its full-time employees who are or who have heretofore been qualified journeymen painters.

(b)  (ii)  The Chicago Painters' Joint Apprenticeship and Building Fund and the Trustees of the Chicago Painters and Decorators Welfare Fund may make contributions for their respective full-time Employees.

(b)  (iii)  The Chicago Drywall Finishers' Joint Apprenticeship, Training, and Building Fund may contribute for its full-time Employees.

(c)  Effective January 1, 2001, the current pension contribution rate per hour or the amount as amended in future bargaining shall be paid to the Pension Fund no later than the twentieth (20th) day of the month after the work was performed. The first report and contribution in a calendar year not received during this grace period shall be assessed liquidated damages amounting to 10 percent of the amount of the contributions which are owing. All other late contributions and reports in the same calendar year will be assessed 15% of the amount of contributions owed as liquidated damages. The Employer acknowledges that the liquidated damages shall be used to defer administrative costs arising by said delinquency and acknowledges the costs to be actual and substantial although difficult to ascertain. However the Employer acknowledges these costs to be at a minimum of 15 percent, waiving the necessity of any additional proof thereon. In addition, delinquent contributions shall bear interest at the prime rate established as of the date of the delinquency by Bank One, Chicago from the due date until they are paid. In the event of a conflict between the Trust Agreement and the bargaining agreement, those terms most favorable to the Trust shall prevail.

(d)  The contributions set forth above shall be made to the Pension Fund for each hour worked by each Employee covered by this Agreement, regardless of the geographic location of the job, unless payment was made to an applicable fund in the geographic area where the work was performed. In no case shall a double payment be required.

**Section 2.  Trust Agreement.**  (a)  Each Employer party to this agreement agrees to pay the sums specified above to the Pension Fund for the purpose of providing pension benefits to each eligible Employee. It is expressly understood and agreed that the Agreement and Declaration

-22-

of Trusts, together with all amendments, rules, regulations, policies, and procedures adopted pursuant thereto are incorporated herein by reference and made a part hereof, and that all Employers party to this Collective Bargaining Agreement agree to become or remain bound by and to be considered a party to said Agreement and Declaration of Trusts as if said Employers had signed the original copies of the aforementioned Trust instruments and all amendments thereto. All Employers party to this Agreement hereby ratify and confirm the appointment of the Employer Trustees of said Trust, who shall, together with their successor Trustees designated in the manner provided in said Agreement and Declaration of Trust, and jointly with an equal number of Trustees appointed by the Union, carry out the terms and conditions of the Trust Agreement.

(b) The Association has designated three (3) Trustees as Employer Representatives. The Union has designated three (3) Trustees as Employee Representatives. The Agreement and Declaration of Trust provides the terms of the Trustees and the terms of all future Trustees; and that whenever a Trustee's term expires or a vacancy in any trusteeship occurs or exists, the Association shall choose or designate the person to fill such Employer trusteeship and the Union shall choose or designate the person to fill such Employee trusteeship.

**Section 3. Information for Trustees—Audits and Collections.** (a) Each Employer shall furnish the Trustees with information such as the names of all subcontractors and all Employees, classifications, Social Security numbers, wages and/or hours worked, and such other information as may be required for the proper and efficient administration of the Pension Fund. Effective June 1, 2003 and thereafter each Employer shall be required to obtain and maintain for a period of seven (7) years weekly time sheets completed, signed and dated by each covered employee for all hours worked.

(b) The Union and/or the Trustees of the Pension Fund shall have the authority to audit the books and records of a participating Employer, either directly or through their authorized representatives, whenever such examination is, in their sole discretion, deemed necessary for the purpose of determining compliance with the provisions of this Agreement. Each participating Employer shall make its books and records available to the Trustees for such purpose. Such books and records shall include, but not be limited to, all cash disbursement journals, payroll records, time records, or any other documents which form the basis of individual payroll records, state unemployment compensation returns, union pension, welfare, apprentice, and deferred savings records to other funds, and all other relevant records which would show payment of wages or fringe benefits. The information supplied by the Employer shall remain confidential and shall be used solely to determine or establish whether or not proper wages and contributions have been made. In the event the audit discloses that the Employer, during the period of the audit, has underpaid its contributions and/or wages, the Employer shall be liable for the costs of the examination, including but not limited to audit fees and reasonable attorneys' fees. The Trustees' authority to waive any costs shall be governed by the terms of the Trust Agreement. The Union shall not be bound beyond the terms of its Constitution and By-Laws.

(c) If any Employer has employed a person or entity in violation of Article XI, Sections 1 and 2 of this Agreement, the number of hours with respect to which such Employer owes benefit



contributions shall be computed by dividing the total dollar amount paid to such Employee as compensation for the work involved by the applicable contractual hourly wage rate or the actual wage rate paid whichever is less. The number of hours so determined shall be presumed to be the number of hours upon which benefit contributions are owed with respect to such Employee. The Employer shall receive credit for all material expenses that can be established.

(d)  In the event the Trustees place a delinquent Employer's account in the hands of legal counsel for collection, the Employer shall be liable for reasonable attorneys' fees and for all reasonable costs incurred in the collection process including court fees, audit fees, etc. Reasonable attorney's fees shall mean:  All reasonable attorneys' fees in the amounts which the Trustees become legally bound to pay, including fees incurred for the recovery of liquidated damages, interest, audit costs, filing fees, and any other expenses incurred by the Trustees.

**Section 4.   Violation of Agreement.**    Failure of any Employer after reasonable notice by the Trustees so to do, to furnish books and records, reports, pay contributions, or comply with the rules and regulations formulated and promulgated by the Trustees of the Pension Fund, shall be considered a violation of the terms and conditions of this Collective Bargaining Agreement.

## ARTICLE VIII

## DEFERRED SAVINGS PLAN FUND

**Section 1.**  (a)  (i)  Effective June 1, 2003, until May 31, 2008, the Employer agrees to deduct from the wages of each Employee for each hour worked by the Employees covered by this Agreement, the following sums:

> The current rate in effect for the period of
> June 1, 2002 to May 31, 2003 is:
> Seventy Five ($.75) Cents per hour;
>
> Effective June 1, 2003 to May 31, 2004,
> the rate is:  Seventy Five ($.75) Cents per
> hour; or such additional amounts as may
> be allocated by the Union from its June
> 1, 2003 to May 31, 2004 total economic
> adjustment package.
>
> Effective June 1, 2004 to May 31, 2005,
> the rate is:  Seventy Five ($.75) Cents per
> hour; or such additional amounts as may
> be allocated by the Union from its June
> 1, 2003 to May 31, 2004 total economic
> adjustment package.

Effective June 1, 2005 to May 31, 2006 the rate is: Seventy Five ($.75) Cents per hour; or such additional amounts as may be allocated by the Union from its June 1, 2005 to May 31, 2006 total economic adjustment package.

Effective June 1, 2006 to May 31, 2007 the rate is: Seventy Five ($.75) Cents per hour; or such additional amounts as may be allocated by the Union from its June 1, 2006 to May 31, 2007 total economic adjustment package.

Effective June 1, 2007 to May 31, 2008 the rate is: Seventy Five ($.75) Cents per hour; or such additional amounts as may be allocated by the Union from its June 1, 2007 to May 31, 2008 total economic adjustment package.

The amounts deducted shall be remitted to the Chicago Painters and Decorators Deferred Savings Plan Fund, hereafter referred to as the "Savings Fund."

(a) (ii)  The Employer shall make deductions on behalf of each of its Employees employed by Employer in a management or supervisory position who are also engaged in work of a Character falling within the jurisdiction covered by this Collective Bargaining Agreement in an amount of no less than One Hundred Sixty (160) hours per month.  Each such Employer shall execute a Participation Agreement in an amount of no less than One Hundred Sixty (160) hours per month. Each such Employer shall execute a Participation Agreement with the Trustees of the Savings Fund, and upon the request of such Trustees for such greater or lesser amounts of hours as the Trustees may deem appropriate.

(a) (iii)  The Employer may make deductions on behalf of superintendents, estimators, and other management personnel for whom contributions to the Savings Fund were heretofore made when such individuals were employed as journeymen painters.  If an Employer elects to bring his superintendents, estimators or other management personnel into the Fund under this agreement, all such employees of that Employer shall be enrolled, and such Employer's election may not be changed until the end of this contract or the expiration of three years, whichever occurs later.  Such deductions shall be made in a monthly amount no less than One Hundred Sixty (160) times the hourly deduction rate specified in this Article.

(b) (i)  The PAINTERS' DISTRICT COUNCIL NO. 14 may elect to come under and make payments to the Savings Fund at the same rate as an Employer for those full-time Employees of the

Council and of its affiliated local unions who are or who have heretofore been qualified journeymen painters. Each local union affiliated with PAINTERS' DISTRICT COUNCIL NO. 14 may elect to come under and make payments to the Savings Fund at the same rate as an Employer for those of its full-time Employees who are or who have heretofore been qualified journeymen painters.

(b) (ii) The Chicago Painters and Decorators Joint Apprenticeship and Building Fund and the Trustees of the Chicago Painters and Decorators Welfare Fund may make deductions for their full-time Employees.

(b) (iii) The Chicago Drywall Finishers' Joint Apprenticeship, Training, and Building Fund may make deductions for its full-time Employees.

(c)     Effective January 1, 2001, the current deferred savings rate per hour or the amount as amended in future bargaining shall be paid to the Deferred Savings Fund no later than the twentieth (20th) day of the month after the work was performed. The first report and contribution in a calendar year not received during this grace period shall be assessed liquidated damages amounting to 10 percent of the amount of the contributions which are owing.   All other late contributions and reports in the same calendar year will be assessed 15% of the amount of contributions owed as liquidated damages. The Employer acknowledges that the liquidated damages shall be used to defer administrative costs arising by said delinquency and acknowledges the costs to be actual and substantial although difficult to ascertain. However the Employer acknowledges these costs to be at a minimum of 15 percent, waiving the necessity of any additional proof thereon. In addition, delinquent contributions shall bear interest at the prime rate established as of the effective date of the delinquency by Bank One, Chicago from the due date until they are paid. In the event of a conflict between the Trust Agreement and the bargaining agreement, those terms most favorable to the Trust shall prevail.

(d) The deduction set forth above shall be made and remitted to the Savings Fund for each hour worked by each Employee covered by this Agreement, regardless of the geographic location of the job, unless payment was made to an applicable fund in the geographic area where the work was performed. In no case shall a double payment be required.

   **Section 2.   Trust Agreement.** (a) Each Employer party to this Agreement agrees to remit the sums specified above to the Savings Fund for the purpose of providing deferred savings to each eligible Employee. It is expressly understood and agreed that the Agreement and Declaration of Trust, together with all amendments, rules, regulations, policies, and procedures adopted pursuant thereto are incorporated herein by reference and made a part hereof, and that all Employers party to this Collective Bargaining Agreement agree to become or remain bound by and to be considered a party to said Agreement and Declaration of Trust and if said Employers had signed the original copies of the aforementioned Trust instruments and all amendments thereto. All Employers party to this Agreement hereby ratify and confirm the appointment of the Employer Trustees of said Trust, who shall, together with their successor Trustees designated in the manner provided in said

Agreement and Declaration of Trust, and jointly with an equal number of Trustees appointed by the Union, carry out the terms and conditions of the Trust Agreement.

(b) The Association has designated three (3) Trustees as Employer Representatives. The Union has designated three (3) Trustees as Employee Representatives. The Agreement and Declaration of Trust provides the terms of the Trustees and the terms of all future Trustees; and that whenever a Trustee's term expires or a vacancy in any trusteeship occurs or exists, the Association shall choose or designate the person to fill such Employer trusteeship and the Union shall choose or designate the person to fill such employee trusteeship.

**Section 3.  Information for Trustees—Audits and Collections.**  (a) Each Employer shall furnish the Trustees with information, such as the names of all subcontractors and all Employees, classifications, Social Security numbers, wages and/or hours worked, and such other information as may be required for the proper and efficient administration of the Savings Fund.  Effective June 1, 2003 and thereafter each Employer shall be required to obtain and maintain for a period of seven (7) years weekly time sheets completed, signed and dated by each covered employee for all hours worked.

(b) The Union and/or the Trustees of the Savings Fund shall have the authority to audit the books and records of a participating employer, either directly or through their authorized representative, whenever such examination is, in their sole discretion, deemed necessary for the purpose of determining compliance with the provisions of this Agreement.  Each participating Employer shall make its books and records available to the Trustees for such purpose.  Such books and records shall include, but not be limited to, all cash disbursement journals, payroll records, time records, or any other documents which form the basis of individual payroll records, state unemployment compensation returns, Union Pension, Welfare, Apprentice, and Deferred Savings records to other funds, and all other relevant records which would show payment of wages or fringe benefits.  The information supplied by the Employer shall remain confidential and shall be used solely to determine or establish whether or not proper wages and payments have been made.  In the event the audit discloses that the Employer, during the period of the audit, has under paid its deductions and/or wages, the Employer shall be liable for the costs of the examination, including, but not limited to, audit fees and reasonable attorneys' fees.  The Trustees' authority to waive any costs shall be governed by the terms of the Trust Agreement.  The Union shall not be bound beyond the terms of its Constitution and By-Laws.

If any Employer has employed a person or entity in violation of Article XI, Section 1 and 2 of this Agreement, the number of hours with respect to which such Employer owes benefit contributions shall be computed by dividing the total dollar amount paid to such Employee as compensation for the work involved by the applicable contractual hourly wage rate or the actual wage rate paid whichever is less.  The number of hours so determined shall be presumed to be the number of hours upon which benefit contributions are owed with respect to such Employee.  The Employer shall receive credit for all material expenses that can be established.

**Section 6.** **Mitten Applicators.** Use of mitten applicators on fire escapes and pipe four (4) inches or less in diameter and pipes that are inaccessible to a brush, is permitted. A protective liner is required in the mitten applicators. Mitten applicators are not to be used with material containing lead.

**Section 7.** **Dipping.** Dipping in oil paint of an object to be painted is prohibited.

**Section 8.** **Tools Issued to Employees.** Painter employees shall furnish the following tools: grip, assorted scrapers up to six (6) inches in width, five gallon bucket opener, wire brush, spinner, assorted screw drivers, duster, pliers. In addition, paper hangers shall supply ruler, smoother, seam roller and level. No other tools, not specifically listed herein, shall be required of any employee.

## ARTICLE X

## WORKING CONDITIONS

**Section 1.** **No Abuse of Employees.** Employer agrees that no charge-man in charge of work shall rush, drive, intimidate, or use foul language towards another Employee, or use his position to abuse or discriminate against another Employee.

**Section 2.** **Dangerous Materials.** Employer further agrees that no Employee or apprentice shall be required to use any poisonous material or material injurious to the health, such as wood alcohol, varnish remover, oxalic acid, or to perform the sanding of lead or other dangerous materials, unless the Employee is protected by respirators and gloves furnished to the Employee by the Employer. Prepared liquid paint and varnish removers, when used, shall be of the non-flammable type. This shall not apply to the use of other liquids or solvents or other methods.

**Section 3.** **Wash-Up and Clothes Storage.** Where lead or other poisonous materials are used, Employer shall furnish hot water, soap, and towels to Employees. Employer shall provide for or arrange for a safe and sanitary space where his Employees can place their clothes while working on the job.

**Section 4.** **Time Sheets.** Effective June 1, 2003 and thereafter each Employer shall be required to obtain and maintain for period of seven (7) years weekly time sheets completed, signed and dated by each covered employee for all hours worked. On all time sheets and records, the time shall be expressed in terms of the actual number of hours worked. Hours for which time and a half is to be paid shall be shown separately at the number of hour actually worked. Each Employee shall make out and sign the time sheets, or if someone else makes out the time sheets for him, the Employee shall sign his time sheets. Daily time sheets to specify in detail the time spent on each room, at or any certain time, are prohibited. It is agreed, however, that time for extra work or work not contained on work ticket or specification shall be given separately, if so required by the

Employer. All Employers, who request or insist on having daily time sheets sent in, shall furnish the men in charge with sufficient stamped envelopes or funds to cover the expense incurred in complying with their demands.

**Section 5.  Weight Limits.**  Employees are prohibited from carrying any material, scaffold, or tools exceeding ten (10) pounds to or from jobs.

**Section 6.  Other Conditions.**    Employer hereby agrees:

(a)  **Drop Cloths.**    That where drop cloths and rags are used, they shall be furnished to workmen in a sanitary condition.

(b)  **Jacks and Ladders.**  That all jacks and ladders over six (6) feet in length must be reinforced with steel rods or rung braces.

(c)  **Stringers & Scaffolding.**  That all stringers sixteen (16) feet or more in length shall be properly reinforced, and that all scaffolding used at any time shall be marked so as to identify clearly the owner thereof.

(d)  **Stilts and Scaffold Substitutes.**  That stilts and other substitutions for scaffolding not meeting the requirements or the rules and regulations, as amended from time to time, promulgated by the Industrial Commission of Illinois under the Health and Safety Act, are prohibited.

(e)  **Elevators & Elevator Shafts.**   All members are prohibited from doing work in elevator shafts or passenger or freight elevators of any or all makes or description while the cars are in regular service.  It shall be the responsibility of the Employer to see that a competent operator is furnished to run such cars, same to be under the direction and control of the man doing the work.  When more than one car is being run in the same shaft, next to, or on either or both sides of the one where the work is required to be done, the adjoining car or cars must be stopped until the work is finished.  If compliance with any of the requirements of paragraph (e) interfere seriously with the business carried on in the building, such work shall be done at such time, nights or holidays, when compliance will not interfere with the business of the building.

(f)  **Gloves.**  Employees may use gloves while at work; and when gloves are necessary, they shall be furnished by the Employer at Employer's expense.

(g)  **Metal Extension Ladders.**  The use of metal extension ladders is prohibited.

(h)  **Inspection of Equipment.**  Employees, while at work, shall be permitted sufficient time for inspection of ladder or scaffolding and for enforcing sanitary conditions of employment.

(i)  **Evening Shop Time.**  When an Employee is required to report at the shop between the hours of 5:00 p.m. and 7:45 a.m., he shall be paid at the rate of time and half the regular wage rate for the time spent by him at the shop during those hours, except as provided in Article V, Sections 2 and 3.

**Section 7.**  **Travel Outside Jurisdiction**  All Employees shall be paid reasonable transportation costs of traveling outside the jurisdiction of PAINTERS' DISTRICT COUNCIL NO. 14. When journeymen are working outside the jurisdiction of PAINTERS' DISTRICT COUNCIL NO. 14, where it is impracticable for them to return to their respective homes each evening, their room and board shall also be paid by the Employer.

**Section 8.**  **Specifications.**  Employer agrees that all specifications shall be placed with the Foreman, Sub-Foreman or the Employee in charge of job, who is to retain same at all times until completion of job and to have same available to show to business representative or job steward whenever requested.

**Section 9.**  **Swinging Scaffolds.**  (a)  A life line and safety belt shall be provided for each man on a swinging scaffold, and the men shall be required to wear the safety belt attached to the life line.  The life line shall be securely fastened above the operation and shall extend a sufficient distance below to permit a safe landing.  The free ends of falls shall be guarded to prevent interference with the scaffold equipment by vehicles or other moving objects.  Manila rope not less than three-quarters (3/4) inch thick or other materials of equivalent strength shall be used for life lines.

(b)  Employer shall place warning signs in appropriate locations so as to notify the public of the presence of swinging scaffold.

**Section 10.**  **Compliance with Legal Requirements.**  In accordance with the requirements of the Occupational Safety and Health Act of 1970, it shall be the responsibility of the Employer to ensure the safety of its Employees and compliance by them with any safety rules contained herein or established by the Employer.  Nothing in this Agreement will make the Union liable to any Employees or to any other persons in the event that work-related disease, sickness, death, injury or accident occurs.

(b)  The Employer will not engage in any litigation against the Union, on a subrogation theory, contribution theory, or otherwise, so as to obtain a money judgment from it in connection with any work-related disease, sickness, death, injury, or accident.

(c)  The Employer shall, at all times, provide safe tools, materials and equipment, and safe working conditions.

(d)  The Employer agrees that, during the life of this Agreement, he will comply with all applicable Federal and State Laws concerning occupational safety and health, including all applicable standards, rules, and regulations issued pursuant thereto.

**Section 11.  Injuries On the Job.**   (a)  If an Employee covered by this Agreement sustains an accidental injury arising out of his employment which requires immediate medical care off the premises, during work hours, such Employee shall be permitted to obtain medical care at once.  He shall be paid his regular wages for the time necessarily spent in going to a physician's office, medical center, or hospital, as well as the time required at such office, center, or hospital, and the time necessarily required to return to the job site.  Except in unusual circumstances, this provision shall be effective only on the date of the injury unless subsequent visits, during working hours, are required by Employer's physician.

(b)  When it is necessary for an injured Employee to be taken to a hospital immediately following an injury, he shall be taken to such hospital at Employer's expense to the hospital nearest to the job site.

(c)  Safe and adequate transportation from a job site following an injury, other than for a minor injury, shall be furnished by the Employer and/or designated agent.  The job steward shall be notified of all such injuries.  If the steward determines that someone shall accompany the injured Employee to the hospital, medical center, physician's office, or Employee's home, the Employer and/or designated agent shall select such person, who shall be compensated at his regular rate for such services.  If the Employer and/or designated agent fails to select such person promptly, the steward shall select such person.  The Union, upon receiving notice, shall notify the Employer of the injury.

(d)  In the event an Employee is injured in the course of his employment, he shall not be dismissed from such employment because of his injury, nor shall he be dismissed during the period of medical care required by said injury, unless there is no work available with his Employer, or unless his dismissal is due to a condition beyond the control of the Employer.  This paragraph shall not obligate Employer to pay Employee while disabled.

(e)  PAINTERS' DISTRICT COUNCIL NO. 14 shall be notified by the Employer immediately following any injury falling within the scope of this Article X, Section 11.

**Section 12.**  All Employees working at the trades shall be required to supply and wear painter's white uniforms.  Such Employee shall purchase and maintain such uniforms in a clean and sanitary condition.

## ARTICLE XI

## MISCELLANEOUS PROVISIONS RELATIVE TO WORK

**Section 1.  Subcontracting to Employees Prohibited.**    Any Employer who subcontracts any work covered by this Agreement will notify the Union of the subcontractor before such work is begun. Employer agrees that he will not sublet any work to any Employee.

(a)   The Employer shall require of the subcontractor a list of employees together with the address, social security number, and the name of employees performing the subcontracted work, the location of the subcontracted work, a brief description of the type of property and a counting of the surfaces that were subcontracted which must be submitted on a form with the subcontracted dollar amount included.  The form must be submitted to the Union before the job starts or the contract is violated and the prime contractor is subject to a fine imposed by the Joint Trade Board together with all other sanctions as provided in the contract.

(b)   In the case of subcontracting, the prime contractor must file a copy of the subcontractor's contribution report forms as an attachment to the prime contractor's monthly remittance form with the fringe benefit offices.  This shall not excuse the subcontractor from filing his own report forms.

**Section 2.   Subcontracting to Others and Application of Contract.**  (a) Any Employer who sublets any of the work coming within the jurisdiction of the Painters shall directly assume the obligations of any subcontractor to the extent of the painter labor employed on work under contract with the Employer for the prompt payment of Employees' wages, Welfare, Pension, Apprentice, and Deferred Savings Plan contributions, including reasonable attorneys' fees incurred in enforcing the provisions hereof.  The Union will, upon written request, furnish written certification to any Employer as to whether a subcontractor is adequately bonded including expiration date of bond and that wages and payment of Welfare, Pension, Apprentice, and Deferred Savings Plan contributions are current.

(b)  Employers shall not contract any work covered by this Agreement to be done at the site of the construction, alteration, painting, or repair of a building, structure, or other work to any person, firm, or company who does not have an existing labor agreement with PAINTERS' DISTRICT COUNCIL NO. 14 covering such work.  The Union will, upon written request, furnish written certification to an Employer as to whether a subcontractor has an existing labor agreement with the Union.

(c)  The terms and conditions of this Agreement shall apply to all Bargaining Unit work performed by the Employer performing such work indirectly if such work is performed by any business entity controlled by the Employer, or if the Employer is a corporation, controlled by the person who controls the Employer.

**Section 3.   Strikes.**  (a) This Agreement shall not destroy the power of the Union to call a strike in any shop or on any job for any justifiable reason.  However a strike shall not be called in any shop without prior hearing of the Joint Trade Board, or representative appointed thereby.

(b)  Nothing in this Collective Bargaining Agreement shall affect the power of the Union to call a strike in any shop or on any job for under payment or lack of payment of wages and fringe benefit contributions.  The right to strike over under payment or lack of payment of wages and fringe benefit contributions need not first go to the Joint Trade Board.

(c)  No agreement to which the Union is not a party shall supersede the terms and conditions of this Collective Bargaining Agreement nor relieve the Employer of the obligation to comply fully with the terms of this Agreement.

**Section 4.  Joint Trade Board.**    Violations of this Agreement shall be referred to the Joint Trade Board for final disposition.

**Section 5.  Painting Departments.** In connection with new work and remodeling, journeymen painters shall not be furnished to any person or firm that does not maintain a regular painting department for a period of nine (9) months in any calendar year.

**Section 6.  Runaway Shops Prohibited.**    The Employer party hereto shall not attempt to engage in any work covered by the Agreement in any area outside of the geographical jurisdiction of the Union party hereto through the use or device of another business or corporation which such Employer controls or through the use or device of a joint venture with another employer or contractor in an outside area, unless such use or device is not for the purpose of taking advantage of lower wages or conditions than are in effect in the home area of such Employer.

**Section 7.  Picket Lines.** Employees covered by this Agreement shall, during the life thereof, have the right to respect any legal picketline, validly established by any bona fide labor organization, and the Union party to the Agreement has the right to withdraw Employees subject to the Agreement whenever the Employer party to the Agreement is involved in a legitimate primary labor dispute with any bona fide labor organization.

## ARTICLE XII

## PAY DAY -- NOTICES TO UNION -- EMPLOYMENT

**Section 1.  Weekly Pay Day.**    (a) Each Employer shall maintain a weekly pay day which shall not be later than 5:00 p.m. on Friday nor more than the fourth day after the end of the Employer's weekly payroll period, at which time all Employees shall be paid in full for all work performed during the preceding work week.  In the event payment is not made by the time specified in this paragraph, the Employee shall be paid double time for all waiting time until payment of the wages due is made in full, and the Employer shall pay all necessary expenses for collecting wages that are due.

(b)  In the event Employees are paid by check which is returned for insufficient funds, then the Union may withhold the men until such funds are immediately paid in cash.  Employees shall be paid for all time withheld up to eight (8) hours a day until the cash is received.  If wages or fringe benefit contributions are returned for insufficient funds, then, at the sole discretion of the Union, the Employer shall be obligated to pay in cash or by Cashier's Check for all wages on a weekly basis, until such time as the Union determines, in its sole discretion, that the Employer may return to paying by check.

**Section 2.  Payment Upon Discharge.**        In the event that an Employee is discharged, he shall, at the time and place of discharge, be paid 70 percent of his full wages to and including the date of discharge.  The balance of monies due him shall be paid in full at the next regular pay period. In the event that the Employer does not make payments as herein provided, double the regular hourly wage for each hour following termination of employment will be paid, until payment is actually made.

**Section 3.  Shop Painting of Trim.** Whenever it becomes necessary for any building trim to be painted in the shop or mill, the job shall be reported to the Union by the Employer when started.

**Section 4.  Reporting All Jobs to Union.**  Employer will report to the Union, in writing, all jobs (including subcontracted work) before beginning work on them.  If the Employer intends to use the special industrial rate provided by Article V, Section 3, this information shall be included on the report to the Union; if this information is not provided in a timely manner, the regular rate of wages will apply.  Employers who fail to report their work in accordance with this paragraph will be assessed liquidated damages in an amount determined by the Joint Trade Board.

**Section 5.  Noncompliance with Reporting Requirements.**  Any Employer who fails to comply with reporting requirements, in addition to provisions of Section 4 above, shall be required to supply a Thirty Thousand Dollar ($30,000.00) bond for the life of the contract.  The Joint Trade Board must meet within five (5) working days of giving notice to the Employer of said violation of this provision.

## ARTICLE XIII

## APPRENTICES AND APPRENTICESHIP FUND

**Section 1.  Required Contributions.** (a) (i) Effective June 1, 2003 to May 31, 2008, the Employers agree to make apprenticeship contributions of Thirty-Four ($.34) Cents per hour for each hour worked by each Employee, including apprentices and trainees covered by this Agreement, in addition to the wages herein stipulated in each year of this Agreement.  This amount may hereafter be increased by allocation from the Union's total economic package.  These additional contributions can be used for the purpose of an increased apprentice stipend or for purposes related to further the apprentice program.  Contributions shall be made to the Chicago Painters and Decorators Joint Apprenticeship and Building Fund, hereafter referred to as the "Apprenticeship Fund".  If any apprentice is required to and does attend school for a full day, the Employer shall, in addition to the time the apprentice works on the job, pay into the Apprenticeship fund for eight (8) additional hours, provided the apprentice has worked four (4) full days on the job, and in the event the apprentice does not work four (4) full days on the job, he shall be contributed for on a pro rata basis; e.g., for two (2) days worked, he shall be contributed for two-fourths (2/4ths) of a day for a full day of school.

<u>Training.</u>    Beginning June 1, 2000, $.01 of the "total economic package" shall be deferred to the J.A.T.C. to provide for a journeyman upgrade program to be administered by the Trustees of said J.A.T.C. and with the Union's cooperation to maintain the $.01 contribution for journeyman upgrade.

(a)  (ii)  The Employer shall make contributions on behalf of each of its Employees employed by Employer in a management or supervisory position who are also engaged in work of a character falling within the jurisdiction covered by this Collective Bargaining Agreement in an amount of no less than One Hundred Sixty (160) hours per month.  Each such Employer shall execute a Participation Agreement with the Trustees of the Apprenticeship Fund, upon the request of such Trustees, for such greater or lesser amounts of hours as the Trustees may deem appropriate.

(a)  (iii)  The Employer shall make contributions on behalf of Superintendents, estimators, and other management personnel for whom contributions to the Welfare Fund are made.  Such contributions shall be made in a monthly amount no less than One Hundred Sixty (160) times the hourly contribution rate specified in this Article.

(b)  (i)  The PAINTERS' DISTRICT COUNCIL NO. 14 may elect to come under and contribute to the Apprenticeship Fund at the same rate as the Association members for those full-time employees of the Council and of its affiliated local unions who are or who have heretofore been qualified journeymen painters.  Each local union affiliated with PAINTERS' DISTRICT COUNCIL NO. 14 may elect to come under and contribute to the Apprenticeship Fund at the same rate as the Association members for those of its full-time Employees who are or who have heretofore been qualified journeymen painters.

(b)  (ii)  The Chicago Painters' Joint Apprenticeship Fund and the Trustees of the Chicago Painters and Decorators Welfare Fund may make contributions for their full-time Employees.

(b)  (iii)  The Chicago Drywall Finishers' Joint Apprenticeship, Training, and Building Fund may contribute for its full-time Employees.

(c)     Effective January 1, 2001, the current apprenticeship contribution rate per hour or the amount as amended in future bargaining shall be paid to the Apprenticeship Fund no later than the twentieth (20th) day of the month after the work was performed.  The first report and contribution in a calendar year not received during this grace period shall be assessed liquidated damages amounting to 10 percent of the amount of the contributions which are owing.  All other late contributions and reports in the same calendar year will be assessed 15% of the amount of contributions owed as liquidated damages.  The Employer acknowledges that the liquidated damages shall be used to defer administrative costs arising by said delinquency and acknowledges the costs to be actual and substantial although difficult to ascertain.  However the Employer acknowledges these costs to be at a minimum of 15 percent, waiving the necessity of any additional proof thereon.  In addition, delinquent contributions shall bear interest at the prime rate established as of the date of the delinquency by Bank One, Chicago from the due date until they are paid.  In the event of a conflict between the Trust Agreement and the bargaining agreement, those terms most favorable to the Trust shall prevail.

(d) The contributions set forth above shall be made to the Apprenticeship Fund for each hour worked by each Employee covered by this Agreement, regardless of the geographic location of the job.

**Section 2. Trust Agreement.** (a) Each Employer party to this Agreement agrees to pay the sums specified above to the Apprenticeship Fund for the purpose of providing apprenticeship training to eligible persons. It is expressly understood and agreed that the Agreement and Declaration of Trust, together with all amendments, rules, regulations, policies, and procedures adopted pursuant thereto are incorporated herein by reference and made a part hereof, and that all Employers party to this Collective Bargaining Agreement agree to become or remain bound by and to be considered a party to said Agreement and Declaration of Trust as if said Employers had signed the original copies of the aforementioned Trust instruments and all the amendments thereto. All Employers party to this Agreement hereby ratify and confirm the appointment of the Employer Trustees of said Trust, who shall, together with their successor Trustees designated in the manner provided in said Agreement and Declaration of Trust, and jointly with an equal number of Trustees appointed by the Union, carry out the terms and conditions of the Trust Agreements.

(b) The Association has designated three (3) Trustees as Employer Representatives. The Union has designated three (3) Trustees as Employee Representatives. The Agreement and Declaration of Trust provides the terms of the Trustees and the terms of all future Trustees and that whenever a Trustee's term expires or a vacancy in any trusteeship occurs or exists, the Association shall chose or designate the person to fill such Employer trusteeship and the Union shall choose or designate the person to fill each Employee Trusteeship.

**Section 3. Information for Trustees --Audits and Collections.** (a) Each Employer shall furnish the Trustees with information such as the names of all subcontractors and all Employees, classifications, Social Security numbers, wages, and/or hours worked, and such other information as may be required for the proper and efficient administration of the Apprenticeship Fund. Effective June 1, 2003. Each Employer shall be required to obtain and maintain for a period of seven (7) years weekly time sheets completed, signed and dated by each covered employee for all hours worked.

(b) The Union and/or the Trustees of the Apprenticeship Fund shall have the authority to audit the books and records of a participating Employer, either directly or through their authorized representative, whenever such examination is, in their sole discretion, deemed necessary for the purpose of determining compliance with the provisions of this Agreement. Each participating Employer shall make its books and records available to the trustees for such purpose. Such books and records shall include, but not be limited to, all cash disbursement journals, payroll records, time records, or any other documents which form the basis of individual payroll records, state unemployment compensation returns, Union Pension, Welfare, Apprentice, and Deferred Savings records to other funds, and all other relevant records which would show payment of wages or fringe

benefits. The information supplied by the Employer shall remain confidential and shall be used solely to determine or establish whether or not proper wages and contributions have been made. In the event the audit discloses that the Employer, during the period of the audit, has underpaid its contributions and/or wages, the Employer shall be liable for the costs of the examination, including, but not limited to, audit fees and reasonable attorneys' fees. The Trustees' authority to waive any costs shall be governed by the terms of the Trust Agreement. The Union shall not be bound beyond the terms of its Constitution and By-Laws.

If any Employer has employed a person or entity in violation of Article XI, Sections 1 and 2 of this Agreement, the number of hours with respect to which such Employer owes benefit contributions shall be computed by dividing the total dollar amount paid to such Employee as compensation for the work involved by the applicable contractual hourly wage rate or the actual wage rate paid whichever is less. The number of hours so determined shall be presumed to be the number of hours upon which benefit contributions are owed with respect to such Employee. The Employer shall receive credit for all material expenses than can be established.

(c) In the event the Trustees place a delinquent Employer's account in the hands of legal counsel for collection, the Employer shall be liable for reasonable attorneys' fees, and for all reasonable costs incurred in the collection process, including court fees, audit fees, etc. Reasonable attorneys' fees shall mean: All reasonable attorneys' fees in the amounts which the Trustees become legally bound to pay, including fees incurred for the recovery of liquidated damages, interest, audit costs, filing fees, and any other expenses incurred by the Trustees.

Section 4.  Violation of Agreement.  Failure of any Employer, after reasonable notice by the trustees so to do, to furnish books and records, reports, pay contributions, or comply with the rules and regulations formulated and promulgated by the Trustees of the Apprenticeship Fund, shall be considered a violation of the terms and conditions of this Collective Bargaining Agreement.

Section 5.  Apprenticeship Rules.  The rules and regulations governing apprentices adopted by the Apprenticeship Fund from time to time and approved by the PAINTERS' DISTRICT COUNCIL NO. 14 and the Association and reviewed by the Bureau of Apprenticeship, United States Department of Labor, shall be binding on the parties hereto, and considered as a part of this Agreement.

(a) Apprentices hired must be enrolled at Chicago Area Painters', Decorators' & Drywall Finishers' Apprenticeship and Training Facility, or such other facility as then administers the PDCA 14 program. Apprentices from District Council No. 14 must be hired first, and if none are available then apprentices from other counties may be considered. Should apprentices from other counties be hired to perform work within the geographical jurisdiction of the PDC 14, such apprentices must attend the trade school administering the PDC 14 program, and the Employer shall make contributions to the PDC 14 Apprentice Fund on their behalf and pay such apprentices in accordance with the terms of this Agreement.

(b) All Non District Council 14 apprentices must be reported to District Council 14 before beginning work in District Council 14.

**Section 6.    Selection and Indenture Apprentices.**    (a) The persons employed as apprentices shall be selected without regard to age, sex, race, creed, color, or national origin.

(b) Every Employer who is a party to this Agreement and who employs an average of five (5) journeymen during six (6) months of a twelve (12) month period agrees to employ one (1) apprentice.    Additional apprentices may be granted to any Employer upon proper application to the Apprenticeship Fund.

(c) All apprentices are to be bound to the Employer by a written contract of indenture for a term of not less than three (3) years or such additional time as is necessary to complete 120 Credited School Days. The terms of which indenture shall be prescribed by the Apprenticeship Fund and shall require that the Employer provide reasonably continuous employment, defined by the Apprenticeship Fund, for the term of the indenture.

**Section 7.    Employment of Apprentices.**    (a)    Where Employer is entitled to an apprentice, he may use one of the first five on the registration list of the Apprenticeship Fund for a trial period of ninety (90) days.    If after said trial period conditions are satisfactory to the Employer, apprentice and the Apprenticeship Fund, the Employer and apprentice will be required to sign the contract of indenture provided for above. If an Employer is found to be abusing the 90 day provisions for the use of apprentice applicants then the privilege can be suspended by the Union unilaterally and the employer must immediately stop the use of apprentice applicants unless reinstated by the Joint Trade Board. This shall apply to new employees hired after June 1, 1991.

(b)  No apprentice will be allowed a trial period with more than two Employers or an Employer a trial period with more than two apprentices consecutively.

(c)  An apprentice shall work for no other Employer than the one to whom he or she is indentured during the time of his or her apprenticeship, except that if, after giving the Employer and the apprentice an opportunity to be heard, the Apprenticeship Fund finds that the Employer has failed to fulfill its responsibilities under the apprenticeship standards, the Apprenticeship Fund may place the apprentice with another Employer.

**Section 8.   Apprentices Work with Journeymen.**   No apprentice shall be permitted to take charge of any job, nor shall any apprentice be permitted to work on any job, unless there is at least one journeyman employed at the same job, except in the final year of his/her apprenticeship.

**Section 9.   Trade School Attendance Required.** All apprentices employed by Employer shall attend the approved Trade School in accordance with a schedule formulated by the Apprenticeship Fund.  A certificate of attendance from the principal of the school must be furnished to the Apprenticeship Fund, evidencing compliance with this requirement, otherwise the apprentice shall not be permitted to work the ensuing quarter.

-40-

**Section 10.  Apprenticeship Fees.**  (a)  The regular wage rate for apprentices shall be the following respective percentages of the current regular wage rate for journeymen:

| Percentage of Journeyman's Rate | Time Period to be Paid |
|---|---|
| 50% | From initiation date to completion of 40 Credited School Days; |
| 65% | From 40 Credited School Days to completion of 60 Credited School Days; |
| 70% | From 60 Credited School Days to completion of 80 Credited School Days; |
| 75% | From 80 Credited School Days to completion of 100 Credited School Days; |
| 80% | From 100 Credited School Days to completion of 120 Credited School Days; |
| 90% | From 120 Credited School Days to attainment of Journeyman status. |

The Apprenticeship Fund shall issue a report of Credited School Days completed for the purpose of establishing the apprentice's wage rate, providing copies to the apprentice's Employer and Coordinator.

(b)  The apprentice shall receive clearance from the school on the one hundred twentieth Credited School Day.  The apprentice shall not appear before the examining board until his or her contract is fulfilled.  During this final seventh (7th) period, the apprentice shall work on the job five (5) full days a week.

**Section 11.   Wages of Apprentices.**  Effective June 1, 2003 the Employer shall pay all pension, welfare, J.A.T.C. Fund, Industry Advancement Fund, Scholarship Fund and the Joint Cooperation Trust Fund, International Union Apprentice Fund and International Cooperation Fund contributions for apprentices for those days on which the apprentice attends school unless the J.A.T.C. confirms in writing the dates and hours not attended at class by an apprentice.  The contribution rate will be the rate then in effect for all Employees covered by those plans.  The hours for which a contribution is due shall be eight for each day the apprentice attends school, provided however, that the Apprenticeship Fund Trustees may, in their discretion, adjust (on a uniform basis) the number of hours for which they contribute to match the number of hours the Employer is obligated to contribute to the Apprenticeship Fund for each apprentice pursuant to Section 1(a)(1) of this Article.

-41-

## ARTICLE XIV

## IUPAT JATF

The agreement between the Employer(s) and Union parties to this agreement regarding payments to the International Union of Painters and Allied Trades Joint Apprenticeship and Training Fund (IUPAT JATF) is as follows:

**Section 1.**    (a)    Commencing with the first day of June 1, 2003 and for the duration of this Agreement, and any renewals or extensions thereof, the Employer, agrees to make payments to the International Union of Painters and Allied Trades Apprenticeship and Training Fund (IUPAT JATF) for each employee covered by this Agreement as follows:

(b)  For the period June 1, 2003 through May 31, 2004, for each hour or portion of an hour worked by an employee, the Employer shall make a contribution of 5 cents per hour to the above named Apprenticeship Fund.

(c)  For the period June 1, 2004 through May 31, 2008 of the Agreement, Employer shall contribute 5 cents per hour for each hour or portion of an hour worked by an employee to the IUPAT JATF plus such additional amounts as may be allocated from the Union's total economic package in its sole discretion.

(d)  Contributions shall be paid on behalf of any employee starting with the employee's first hour of employment in a job classification covered by this Agreement. This includes, but is not limited to apprentices, journeymen, and probationary employees.

(e)  The payments to the Apprenticeship Fund required above shall be made to the "International Union of Painters and Allied Trades Joint Apprenticeship and Training Fund (IUPAT JATF)" which was established under an Agreement and Declaration of Trust, effective May 1, 1995. The Employer hereby agrees to be bound by and to said Agreement and Declaration of Trust, as though he had actually signed the same.

**Section 2.** (a) The Employer hereby irrevocably designates as its representatives on the Board of Trustees of the International Fund (IUPAT JATF), such Trustees as are now serving, or who will in the future serve, as Employer Trustees, together with their successors, as provided for in the aforesaid Trust Indenture.

(b) The Union hereby irrevocably designates as its representatives on the Board of Trustees of the International Fund (IUPAT JATF), such Trustees as are now serving, or who will in the future serve, as Union Trustees, together with their successors, as provided for in the aforesaid Trust Indenture.

(c) The parties hereto further agree to be bound by all actions taken by the Trustees of the International Fund (IUPAT JATF) pursuant to the said Agreement and Declaration of Trust.

**Section 3**. All contributions shall be made at such time and in such manner as the Trustees require; and the Trustees shall have the authority to have a Certified Public Accountant audit the payroll and wage records of the Employer for the purpose of determining the accuracy of contributions to the Apprenticeship Fund.

**Section 4**. If an Employer fails to make contributions to the International Union of Painters and Allied Trades Joint Apprenticeship and Training Fund (IUPAT JATF) within 20 days after the date required by the Trustees, such failure shall be deemed a violation of this Agreement, and the Union shall have the right to take whatever steps are necessary to secure compliance with this Agreement, any provision hereof to the contrary notwithstanding, and the Employer shall be liable for all costs of collecting the payment due together with attorneys' fees and such penalties as may be assessed by the Trustees. The Employer's liability for payment under this Article shall not be subject to or covered by any grievance or arbitration procedure or any "no-strike" clause which may be provided or set forth elsewhere in this Agreement.

**Section 5**. The Apprenticeship Plan adopted by the Trustees of said Apprenticeship Fund shall at all times conform with the requirements of the Internal Revenue Code and other applicable laws and regulations so as to enable the Employer at all times to treat contributions to the Apprenticeship Fund as a deduction for income tax purposes.

## ARTICLE XV

## INSURANCE, TAXES, AND SURETY BOND

**Section 1.  Workers Compensation and Occupational Diseases Coverage – Wage and Fringe Benefit Bond.**  (a)  Each Employer agrees, upon signing this Agreement, to elect to be bound to the provisions of the Illinois Workmen's Occupational Diseases Act and shall furnish to the Association a Certificate of Insurance or of Self-Insurance covering all liability under such Act, and agrees further to furnish a Certificate of Insurance or of Self-Insurance to the Association covering liability under the provisions of the Illinois Workmen's Compensation Act.

(b) (1).  Each Employer agrees that before commencing any work to which this Agreement applies, a performance bond in the sum of Fifteen Thousand Dollars ($15,000.00) shall  be provided to insure the prompt and full payment of all contributions due to the Welfare Fund, Pension Fund, Deferred Savings fund, and the Apprenticeship Fund and wages. Such bond, which shall be in the form appended hereto as Exhibit A or in an alternate form approved in writing by the parties hereto, shall:



(1) be written by an insurance carrier with reserves in excess of One Million Dollars ($1,000,000.00) authorized, license s, or permitted to do business in the State of Illinois; or

(2) be secured by a cash deposit of the full amount of such bond in an account maintained jointly by the Trustees of the four funds; or

(3) be secured by other assets or personal sureties acceptable to the Trustees which equal or exceed in value the full amount of the bond; or

(4) be secured by any combination of (1), (2), and/or (3) above; and

(5) be payable to the Trustees of the respective funds, or to the employees as their interests may appear, in the event the Employer fails to make prompt and full payment of his wages or fringe benefit fund contributions. Fringe benefit fund contributions shall be given priority if the total claims exceed the amount of the bond.

If, for any reason, the amount or value of the security provided by the Employer should decrease below the amount specified above, the Employer agrees to provide such additional security as may be necessary to restore it to the proper sum upon the written request of the Trustees of any of the Funds.

(b) (2). The Association shall have the right to satisfy on behalf of its members, or any of them, the bonding requirement of paragraph (b)(1) above by the posting of a blanket bond in an amount of no less than Two Hundred Fifty Thousand Dollars ($250,000.00). If any Association member is excluded from such bond or if any Employer previously covered by such bond ceases to be eligible for coverage because of the cessation of its Association membership, the Association shall notify the Union and the respective Funds of such exclusion in writing; bond coverage for the excluded member or Employer shall continue for sixty (60) days following receipt of such notice.

(b) (3). In the event an Employer fails for any reason to satisfy the bonding requirement of paragraph (b)(1) above, the Employer shall be personally liable to the Funds named in paragraph (b)(1) in the amount of Thirty Thousand Dollars ($30,000.00) plus all unpaid amounts in excess of that sum which are due the Funds by that Employer. In the event the Employer is a corporation, liability under this paragraph shall be imposed not only on the corporation, but also personally on each corporate official of that Employer empowered to execute agreements or sign checks on the corporation's behalf, or to designate the persons empowered to do so. The provisions of this paragraph shall in no way relieve or excuse any Employer of the obligation to provide the bond described in paragraph (b)(1) above, nor shall this provision limit the personal liability of said corporate officers based on operation of law.

-44-

(b) (4). Any Employer commencing work in violation of the requirements set forth above shall be in violation of this Fringe Benefit Fund contribution payment provision of this Agreement.

**Section 2. Unemployment Compensation Act Coverage.** It is agreed that all Employers not otherwise required by pay contributions under the Illinois Unemployment Compensation Act, and regardless of the number of men employed, shall voluntarily elect to become subject thereto and liable for the payment of contributions thereunder.

**Section 3. Wage and Withholding Statements.** On each payday, the Employer shall deliver to Employees a statement showing the amount withheld for taxes, amount deducted for Deferred Savings Plan, and total hours worked, both regular and overtime.

**Section 4. Fringe Benefit Stamp.** Employees' pay checks issued by members of the Association shall bear the following stamp: "Welfare Fund and Pension Fund contributions are being paid for you for this pay period."

## ARTICLE XVI

## JOINT TRADE BOARD

**Section 1. Designation of Members - - Board Rules.** (a) The parties hereto agree that, during the term of this Agreement, there shall be a standing Joint Trade Board composed of four (4) representatives designated by the Association and four (4) representatives designated by the Union, one of whom shall be elected as Chairman and one of whom shall be elected as Secretary of said Board. In order to assure equal Employer and Union representation at all times, it is agreed that whenever a vacancy exists and whenever a member of the Joint Trade Board is absent from a meeting, if such vacancy or absence results from a lack of a Union representative or representatives, the vote or votes represented by such vacancy or absence shall be divided equally among the remaining Union representatives, each of whom shall be entitled to vote the whole or fractional vote or votes allocated to him as a result of such division, in addition to his own vote, until such vacancy is filled or such absence terminates. If such vacancy or absence results from a lack of an Employer representative or representatives, the vote or votes represented by each vacancy or absence shall be divided equally among the remaining Employer representatives, each of whom shall be entitled to vote the whole or fractional vote or votes allocated to him as a result of such division, in addition to his own vote, until such vacancy is filled or such absence terminates.

(b) The Joint Trade Board shall have the right to set up its own rules and regulations providing ways and means of enforcing and adjudicating this Agreement and any Employer who has signed an Agreement with the Union agrees to be bound by the decisions of the Joint Trade Board. Such rules and regulations are to be published in booklet form for distribution to the parties under this Agreement.

**Section 2. Jurisdiction.** (a) To the Joint Trade Board shall be referred all disputes and matters of controversy arising under the provisions of this Agreement.

-45-

(b) Any party to this Agreement may, by appeal from the decision of either party hereto, request a hearing of the matter in dispute by the Joint Trade Board, and such Joint Trade Board shall thereupon proceed to hearing and decision of such matter.

(c) If the Joint Trade Board finds that an Employer who is bound by this Collective Bargaining Agreement or Employers who have signed an agreement with the Union agreeing to be bound by the decisions and rules of the Joint Trade Board is in violation of ~~their~~    agreement, the Joint Trade Board is authorized to issue an award of actual damages, plus fines, and assess liquidated damages which shall include interest, costs, attorneys' fees, administrative expenses, auditing or accountants' fees, research, investigation, and stenographic expenses in the event of a transcript in obtaining or enforcing the award. Said fines shall be paid to the Cooperation Trust Fund. In the event of a deadlock of the members of the Joint Trade Board, all matters in dispute shall be referred to an arbitrator selected by a majority of the Joint Trade Board.

**Section 3.  Board Decision Final and Binding.** The Joint Trade Board, by a majority vote of all of its members, may decide matters of disputes submitted hereunder which involve the interpretation, application, or adherence to the terms of this Agreement, with the exception of matters arising under Articles VI, VII, VIII, and XIII hereof. Such decision and the remedy set by the Board shall be binding and final on the parties to such matter or dispute.

**Section 4.  Hearing Expenses.** In all hearings conducted by the Joint Trade Board, the necessary expenses incidental thereto pertaining to investigations, research work, court reporter, or other stenographical services, transcript of testimony, if required, and all other expenses thereto, shall be paid by the party requesting the hearing; and if the Joint Trade Board request, the estimated costs thereof must be paid in advance of the hearing.

## ARTICLE XVII

## COOPERATION FUND

**Section 1.** The Chicago Painters and Decorators Joint Cooperation Trust was established June 1, 1991. The purpose of this Trust shall be to improve the labor-management relationships, job security and organizational effectiveness of the painting industry in such areas as the Union has or acquires geographic jurisdiction.

**Section 2.** The Trust shall be managed by a Board of four Trustees, a Trustee and an alternate to be appointed by the Union and a Trustee and an alternate to be appointed by the Association. The Trust shall incorporate audit and impasse procedures in compliance with LMRA §302.

**Section 3.** The Employer shall contribute to this Trust the sum of one cent (14) for each hour worked by an Employee or any other person whose work is subject to this Agreement. These payments shall be made for the period June 1, 2003 through May 31, 2008 only, unless the Association, in its discretion, elects to continue such funding -- at the same or lower rate -- for

-46-

additional 1 year periods which shall end with the expiration date of this Agreement. Each Employer shall be permitted to credit against the hourly contribution required hereunder such amounts as such Employer actually paid to the Chicago Painting and Decorating Contractors' Industry Advancement and Promotional Fund.

**Section 4**. The Employer hereby irrevocably designates as its representatives on the Board of Trustees such Trustees, such Trustees as are now serving, or who will in the future serve, as Employer Trustees, together with their successors.

**Section 5**. All contributions shall be made at such time and in such manner as the Trustees require; and the Trustees may at any time conduct an audit in accordance with the Agreement and Declaration of Trust. The contribution rate may be increased based upon a reasonable demand made by the Association and approval of such an increase by the Union. In the event an increase is approved by the Union for the Industry Advancement Fund pursuant to the provisions of Article XIX, Section 1 hereof, a like increase will be made to the Cooperation Trust.

**Section 6**. If an Employer fails to make contributions to the Fund within twenty days after the date required by their Trustees, the Union shall have the right to take whatever steps are necessary to secure compliance with this Agreement, any other provision hereof to the contrary notwithstanding, and the Employer shall be liable for all costs of collection of the payments due together with attorneys' fees and such penalties as may be assessed by the Trustees. The Employer's liability for payment under this Article shall not be subject to or covered by any grievance or arbitration procedure or any "no-strike" clause which may be provided or set forth elsewhere in this Agreement.

## ARTICLE XVIII

## LABOR MANAGEMENT COOPERATION INITIATIVE

Commencing with the 1st day of June, 1997, and for the duration of this Agreement, and any renewals or extension thereof, the Employer agrees to make payments to the Painters and Allied Trades Labor-Management Cooperation Initiative ("Initiative") for each employee covered by this Agreement, as follows:

(a)    For the period June 1, 2003 through May 31, 2008, Employer shall make a contribution of 5 cents (5¢) per hour or a portion thereof for which an employee receives pay. The amount may be increased in each contract year from the Union's total economic adjustment package.

For the purpose of this Article, each hour paid for, including hours attributable to show up time, and other hours for which pay is received by the employee in accordance with the Agreement, shall be counted as hours for which contributions are payable.

(b)    Contributions shall be paid on behalf of any employee starting with the employee's first day of employment in a job classification covered by this Agreement. This includes, but is not limited to, apprentices, helpers, and probationary employees.

(c)    The Employer and Union signatory to this Agreement agree to be bound by and to the Agreement and Declaration of Trust, as amended from time to time, establishing the Fund.

(d)    The Employer and Union signatory to this Agreement agree to be bound by and to the Agreement.

## ARTICLE XIX

## INDUSTRY ADVANCEMENT FUND

**Section 1.**  During the period June 1, 2003 to May 31, 2008 each Employer shall contribute to the Chicago Painting and Decorating Contractors' Industry Advancement and Promotional Fund three-tenths (3/10ths) of one (1%) Percent of the gross wage of Employees covered by this Agreement. Such contributions shall be made at the same time and in the same manner as contributions are made to the other funds maintained under this Agreement  The Industry Advancement Fund contribution rate may be increased based upon a reasonable demand made by the Association and approval of the increase by the Union. In the event such an increase is approved by the Union for the Industry Advancement Fund, a like increase will be made to the Cooperation Trust.

**Section 2.**  It is expressly understood and agreed that the Agreement and Declaration of Trust creating the Chicago Painting and Decorating Contractors' Industry Advancement and Promotional Fund, together with any amendments and by-laws pertaining thereto are made a part of this Agreement and each Employer party to this Collective Bargaining Agreement agrees to become and remain bound by, and to be considered a party to said Agreement and Declaration of Trust, as if that Employer had signed the original copy of the trust instruments and all amendments thereto.

**Section 3.**  Inasmuch as the existence and utilization of the Chicago Painting and Decorating Contractor's Industry Advancement and Promotional Fund should result in greater job opportunities, the Union agrees to cooperate in assuring that the contributions required by this Article are in fact made by Employers bound by this Agreement.

**Section 4.**  The collection of amounts due under this Article shall not be subject to the procedures set forth in Article XVI of this Agreement.

**Section 5.**  The Employers shall defend, indemnify and save the Union harmless against any and all claims, demands, suits or other forms of liability that may arise out of or by reason of action taken for the purpose of complying with this Article.

## ARTICLE XX

## EXECUTION OF AND RESPONSIBILITY
## UNDER AGREEMENT -- RECORDS

**Section 1.    Acts of Individual Members.**    The parties hereto agree than an act of a member of the Union shall not be binding on the Union unless such act is expressly authorized by said Union and that the Association shall not be liable for any action or failure to act on the part of any Contractor or employer.  The Union agrees to provide the Joint Trade Board with information and records concerning non-association Employers signatory to this Agreement.

**Section 2.    Association Roster.**    The Association shall furnish the PAINTERS' DISTRICT COUNCIL NO. 14 with a complete roster of the members of the Association and the record of Unemployment Insurance Number for each member.

**Section 3.    Printing of Agreement.**    The Association shall approve and pay for any expenses incurred in the printing of this Agreement.

**Section 4.    Association Files.**    The Association agrees to provide for and set up a complete filing system which shall contain the following:

(a)  The names and addresses of all Contractors who are members of the Association.

(b)  Certificate of Insurance from the insurance company showing Compensation and Occupational Disease coverage under the Illinois Workmen's Compensation Act and Occupational Disease coverage under the Illinois Workmen's Compensation Act, the policy numbers, and the date of termination of said policies.

**Section 5.    Referral of Journeymen.**    The Union and the Employer agree that the referral of journeymen shall be on the following basis:

(a)  Selection of applicants for referral to jobs shall be on a non-discriminatory basis and shall not be based on, or in any way affected by, Union membership, by-laws, rules, regulations, constitutional provisions, or any other aspect of or obligation of Union membership, policies, or requirements.

(b)  The Employer retains the right to reject any job applicant referred by the Union.

(c)  The Union and the Employer shall post in places where notices to all Employees and applicants for employment are customarily posted, all provisions relating to the functioning of the hiring provisions of this Agreement.

## ARTICLE XXI

### MOST FAVORED NATIONS CLAUSE

It is the intent of the Union that this Agreement will establish standard wages, hours, terms, and working conditions to prevail within the Union's geographic jurisdiction for all work of a type covered by this Agreement, except in those instances where the International Union otherwise directs or where the Union has previously established a different bargaining history with another association of Employers. The Union does not intend to enter into any agreement with any Employer not covered by the foregoing exceptions which contains better language or conditions.

## ARTICLE XXII

### PAINTERS EDUCATION AND SCHOLARSHIP FUND

Effective June 1, 2003 through May 31, 2008 each Employer agrees to contribute three (3 ) cents per hour for each hour worked by each employee covered by this agreement to the Painters Education and Scholarship Fund plus such additional amounts as may be allocated from the Union's total economic adjustment package in each year of the agreement.

All other provisions of Article VI, Sections 1 (a)(iii) through 4 shall apply to the Scholarship Fund as if fully restated herein.

In order to be eligible for a scholarship, the participant must have earned a full pension credit for each of the two years preceding the award of the scholarship and be employed by a contributing employer to the Scholarship Fund.

## ARTICLE XXIII

### ALCOHOL AND SUBSTANCE ABUSE

**Section 1.**    The dangers and costs which alcohol and other chemical abuses can create in the painting and decorating industry in terms of safety and productivity are significant. The parties to this Agreement resolve to combat chemical abuse in any form and agree that to be effective, programs to eliminate substance impairment should contain a strong rehabilitation component. The Employer and Union have negotiated the following items of drug and alcohol policy subject to all applicable laws and regulations, procedural safeguards, scientific principles, and legitimate interests of privacy and confidentiality. When drug and alcohol testing is performed, all testing shall be conducted in accordance with the procedures outlined below.

**Section 2.**    (a) For purpose of this Article, the phrase "Prohibited Substances" shall mean and include any illegal drugs, controlled substances (other than properly prescribed and utilized medications), look alike drugs, designer drugs, and alcoholic beverages.



Drugs to be tested for include:

| | |
|---|---|
| - Amphetamine | - Barbiturates |
| - Cocaine | - Bensodiazephines |
| - Marijuana | - Methaqualone |
| - Opiates | - Propoxyphine |
| - Phencyclidine | - Alcohol |

(b)  For the purpose of this Article, the term "Jobsite" shall include that portion of the site on which construction or construction related activities or painting and decorating is taking place as well as that portion of the site or project which is used for parking, and shall also include automobiles, trucks and other vehicles owned or leased by the Employer.

**Section 3**.  It is recognized that there are certain prescription medications which may impair the performance of job duties and mental and/or motor functions.  In such cases, with the permission of an Employee and after consultation with such Employee's physician or other physician, the Employer shall attempt to accommodate an Employee.

**Section 4.**    An Employee who is involved in the sale, possession, purchase or distribution of a Prohibited Substance on the jobsite may be subject to disciplinary action up to and including termination. An Employee who uses, a Prohibited Substance on the jobsite or is determined to be under the influence of a Prohibited Substance on the jobsite, may be terminated.

**Section 5.**    Commencing June 1, 2003, Painters District Council No. 14 shall initiate and conduct a voluntary drug and alcohol testing program with the specimen to be collected by a recognized testing facility or its agent and the specimen to be tested by a NIDA Certified Independent Laboratory. The program shall be open to all members of Painters District Council No. 14. Persons may voluntarily submit themselves for testing and, if they test negative for alcohol or drugs, will be issued a drug-free card which shall be valid for a period of two years from the date of issuance. The cost of the test shall be born by the Cooperation Trust Fund. Persons who do not pass the drug and alcohol test will not be eligible to test again for a sixty (60) day period. Any re-test shall be at the member's own expense. The Union shall conduct testing of volunteers over a 90 day period commencing June 1, 2003. The Union shall agree that drug test screening is a condition of acceptance into its apprenticeship program.

Persons who test positive for drugs or alcohol shall receive notification of services that are available through the Members Assistance Program. Such test results will be kept confidential and not disclosed to anyone else.

The Cooperation Trust Fund will pay for one voluntary drug test every two years for any member during the 90 day Voluntary Period. Employer shall pay for any incident testing for cause and in the event of a negative response, reimburse the employee for all time spent, not to exceed sixteen hours at the straight time rate, and reinstate him to his former position.



Effective June 1, 2003, Employer may request persons holding drug-free cards. An employee who wishes to be tested but has missed the 90 day voluntary period will be tested by the CTF and IAF as a shared expense.

An Employer requesting drug-free card referrals must submit to the Union proof that all of its hourly employees who will be present or perform work on the site, including management, non-management, Union, and non-Union have been tested by a MAP approved drug and alcohol program that meets or exceeds Union standards and certify that all its hourly employees are drug-free.

The burden of compliance is upon the Employer to assure a drug-free workplace and the Union assumes no liability for safety of the employer's facility or workforce.

Any Employee, drug-free card holder or otherwise, may only be tested for cause based upon an incident as defined in Paragraph 6 below. If a "drug-free" Employee tests positive, his drug-free card will be forfeited.

**Section 6.  Incident Testing.**  If an Employee is involved, or injured in a workplace accident, the Employee may, at the discretion of the Employer, be required to submit to a urine test and/or alcohol breathalyzer test to determine the presence of alcohol or drugs in the body, provided:

(a)    The supervisor must immediately notify the Business Manager or his representative.

(b)    Employer representatives, supervisors and key management jobsite personnel and all jobsite hourly employees, business agents, job referral administrators, and union stewards will be provided with a training program which will include the information required to make a proper determination as to the fitness for duty issues and proper implementation of this program.

A Union sponsored class will be conducted once per quarter or as needed and funded by the Cooperation Trust Fund for management personnel responsible for using the voluntary drug test program. All jobsite hourly employees, business agents, job referral administrators and union stewards, management representatives or personnel must have undergone equivalent testing, must possess a current, valid "Drug-Free Card" to participate in the implementation of this program.

(c)    If incident testing is to occur, the Employee shall have the right to have a representative of the Union present, which may be the Business Representative. If the Business Representative is not accessible within one (1) hour, the job steward, or a co-worker of the Employee's choosing shall serve as representative.

(d)    The Employee will be provided with an opportunity to explain his or her conduct at a meeting with the management, including the Union Representative referred to in Section 6(c), provided that such Union Representative is reasonably available and provided further that all



reasonable efforts have been made to attempt to have such Union Business Representative present within one (1) hour.

Section 7. An employee who refuses to submit to incident testing requested in Section 6 is subject to immediate disciplinary action and surrender of his drug-free card and will not be issued another card until an assessment of his fitness for duty is approved by the MAP office. Any journeyman or apprentice painter who refuses two (2) times in a twelve (12) month period will be referred to the Business Manager for the option of an assessment by the MAP Office as described in Paragraph 7(a) below or Executive Board Review as described in Paragraph 7(b). The individual will have the option of:

(a)    Voluntarily enrolling in the MAP Program or his own private DASA (Department of Alcohol and Substance Abuse) approved program at his expense, which may recommend his release to return to work or continuance in the program. MAP enrollees may be routinely tested for 180 days following enrollment in the Plan by the provider of care; or

(b)    Appearing before the Board of Business Representatives of the Union who may either send him to MAP for and may require the participant to fully participate in the MAP Program, or return the employee to employment with consultation and recommendation of the MAP Program.

Section 8. All incident drug testing shall take place at a recognized medical facility or certified, independent laboratory collection site at the expense of the Employer, who shall also bear the expense of transportation to the collection site. The LMCF will reimburse the Employer for the cost of testing which results in a positive reading.

Section 9. When a test is required, the specimen will be identified by a code number, not by name, to insure confidentiality of the donor. Each specimen contained will be properly labeled and made tamper-proof.

Section 10. The handling and transportation of each specimen will be properly documented through the strict chain of custody procedures.

Section 11. Any urine sample taken for testing must be tested as follows:

(a)    For screening; and

(b)    In the event the screening test is positive, for confirmation testing by gas chromatography/mass spectrophotometry (GC/MS). This test will be on a specimen taken with the original specimen used at the initial screening. The initial test shall be paid for by the Employer who shall be reimbursed by the CTF if the result is positive. Any subsequent retest shall be paid by the requesting employee and shall be conducted within two (2) working days of the employee's notification of the positive test result.



**Section 12.**    All testing shall be performed in accordance with the guidelines set forth by the National Institute on Drug Abuse and the U.S. Department of Health and Human Services.

**Section 13.**    The Employer, the Union, and all of the medical personnel, and the personnel of the laboratory/testing facility shall adhere to the American Occupational Medical Association's Code of Ethical Conduct for physicians providing occupational medical services and to the AOMA Drug Screening in the workplace Ethical Guidelines.

**Section 14.**    (a)    An Employee undergoing testing shall be placed on an unpaid leave of absence pending the results of the screening test.

(b)    In the event that the results of the screening test are negative, the employee shall be paid for all time involved in the testing process including time of transportation to the testing site with back pay not to exceed sixteen hours at the straight time rate but which shall be a minimum of two (2) hours at straight time rates. In the event that the results of the screening test are positive, there shall be confirmation testing as described in Section 11(b) above. In the event the results of the confirmation testing are negative, the Employee shall be reinstated with back pay not to exceed sixteen hours at the straight time rate. Unless an initial positive result is confirmed as positive, it shall be deemed negative and reported by the laboratory as such. An employee tested and confirmed as positive may be removed from the work site.

(c)    In the event that the results of the confirmation testing are positive by virtue of a urine and breath alcohol screen of less than .08, the following applies:

    (1)    The Employee shall surrender his/her drug-free card
    (2)    The Employee may be terminated
    (3)    The Employee will not be reimbursed for time of testing
    (4)    Upon the second occasion within a twelve (12) month period, the Employee will be referred to the Business Manager for the option of an assessment by the MAP Office or Board of Business Representatives as described in Section 7(b).

(d)    In the event that the results of the confirmation testing are positive by virtue of a urine and breath alcohol screen of greater than .08, the following applies:

    (1)    The Employee shall surrender his/her drug-free card
    (2)    The Employee may be terminated
    (3)    The Employee will not be reimbursed for time of testing
    (4)    The Employee will be referred to the Business Manager for the option of an assessment by the MAP Office or Board of Business Representatives as described in Section 7(b).

(e)    In the event that the results of the confirmation testing are positive by virtue of a substance other than alcohol described in this policy without proof of being properly prescribed and utilized by a licensed medical doctor, the following applies:

(1)    The Employee shall surrender his/her drug-free card
(2)    The Employee may be terminated
(3)    The Employee will not be reimbursed for time of testing
(5)    The Employee will be referred to the Business Manager for the option of an assessment by the MAP Office or Board of Business Representatives as described in Section 7(b).

**Section 15.**    (a)    An Employee who fails to cooperate, abandons or does not complete the treatment program prescribed by the MAP counseling or Board of Business Representatives recommendation or who fails to live up to the terms and conditions of the MAP Referral Agreement will be subject to termination.

(b)    If treatment necessitates time away from work, the Employer may provide for the Employee an unpaid leave of absence for purposes of participation in an agreed upon treatment program. An Employee who successfully completes a rehabilitation program shall be reinstated to his or her former employment status, if work for which he or she is qualified exists.

(c)    In order to ensure confidentiality in the MAP Program, the Employer and Union shall each designate a person as the Employee Representative. The results of a positive test will only be made known to: the employee, the Employer (positive/negative information only) and the Business Manager. Upon request, the testing facility and/or MAP Office shall make available to the Employee, the Laboratory Reports concerning his/her positive test results. The results of any positive test will not be released to any third party or outside agency unless required by law or with written permission of the Employee.

(d)    For any new job obtained, the Employer may declare the site to be a "drug free environment" provided Employer tests all company personnel, including supervision Union or hourly employees of other trades working on the drug free environment site. Painter employees who do not possess Drug Free Cards, may volunteer to work on the site and volunteer to submit to testing through an approved laboratory. The cost of testing to be born 50% by the IAF and 50% by the CTF.

(e)    The employees who legitimately possess Drug Free Cards shall only be retested during the card's effective period if it is required by the Owner or the Awarding Agency specifications so require, and the Union is notified and agrees in writing to such additional testing requirements limited solely to that project site.

-55-

**Section 16.**    All disputes or controversies arising from this policy and program shall be subject to the grievance procedure of the Collective Bargaining Agreement contained in Article XVI, Joint Trade Board.

**Section 17.**    All employees covered by this program will be required to sign an acknowledgement of receipt of this written program and are subject to retesting upon expiration of the two year drug-free card program.

**Section 18.**    Any employee found to be utilizing a fraudulent drug-free card, or misrepresenting the status of his drug-free card will be subject to disciplinary action.

**Section 19.**    If an Owner or General Contractor requires as a condition of biding a drug policy which is different than the above for all trades performing work on its premises, the Employer may request the Union, in its sole discretion, to permit the Employer's Employees to submit to such testing program if it is likely that no Employer would otherwise be able to secure such work.

## ARTICLE XXIV

## DURATION OF AGREEMENT

This Agreement shall remain in full force and effect from June 1, 2003 through May 31, 2008, and shall continue thereafter unless there has been given not less than sixty (60) days' nor more than ninety (90) days' written notice by registered or certified mail, by either party hereto, of the desire to modify and amend this Agreement through negotiations. Failure to give notice of a desire to modify and amend this Agreement shall result in year to year automatic renewals of this Agreement, and failure to give the required notice of a desire to negotiate independently of the Association will mean that the Employer and the Union are to be bound by the area-wide contract negotiated by the Union and the Association during the life of any such newly negotiated contract, together with an amendments thereto.

IN WITNESS WHEREOF the parties set their hands and seals this _____ day of April, 2003.

For:
PAINTING AND DECORATING
PAINTERS CONTRACTORS
ASSOCIATION, CHICAGO COUNCIL

_____
Keith Farnham, Its President

_____
Miles W. Beatty, III, Its Secretary

For:
DISTRICT COUNCIL NO. 14

_____
Gerald C. Harms, Its Secretary-Treasurer

**International Painters and Allied Trades Industry Pension Fund**

OFFICE OF GARY J. MEYERS, FUND ADMINISTRATOR    202 | 783 | 4884    FAX 202 | 393 | 6475
UNITED UNIONS BUILDING • 1750 NEW YORK AVENUE, N.W. • SUITE 501 • WASHINGTON, DC 20006-5301

May 12, 2006

Mr. Kurt Arft
Stateline Glass & Mirror Inc.
372 Marshall Drive
Antioch, IL 60002

Employer #:   S-05338
Contract ID#:   DC000014180000000
Zone: Z01    Class: 180
Subclass: 00   LU/DC#: LU000027

Dear Mr. Arft:

Your company, Stateline Glass & Mirror Inc. (hereinafter "the Company"), is delinquent in contributions to the International Painters and Allied Trades Industry Pension Fund (hereinafter "the Fund") in principal of $16,384.00, and $228.93 in interest assessed through May 30, 2006 for the period of November 2005 and January 2006 through March 2006, for a total of $16,612.93.

Solely in consideration of the fact that if the Company is required to pay the full delinquency immediately it would endanger the financial stability of the Company, and hence the livelihood and pension credits and benefits of the participating employees, the Trustees of the Fund have agreed to permit you to follow the time payment plan outlined in this Promissory Note.

1.   The total principal amount as set forth above, and interest accruing, amortized at seven (7%) percent per annum, must be paid in full no later than January 15, 2007.

2.   The principal and interest shall be paid at the rate of $1,900.14 **(to be overnighted)** per month, for 9 months, payable with each current remittance report submitted hereafter, or in any month in which a remittance report is not submitted, by the 15th of that month, until the entire debt has been paid.

3.   The attached worksheet, marked Exhibit A, and incorporated herein by reference as though fully written herein, sets forth the total principal debt including interest, the required monthly payments, and their respective due dates. The Company agrees that Exhibit A represents the correct amounts owed this Fund.

4.   The Company agrees that current remittance reports for all Union jurisdictions will be filed and contributions paid in the manner and within the time required by the Trustees of this Fund. If any further delinquency occurs from this date forward, either as to the debt previously incurred, or as to current payments, such delinquency will be deemed a breach of this agreement and the entire debt, including any amounts conditionally waived, will be due immediately. In that event, appropriate action may be immediately undertaken by the Trustees of the Fund or the Local Union or District Council involved, in accordance with the terms of the applicable Collective Bargaining Agreement and with the Agreement and Declaration of Trust.

28503

EXHIBIT

3

Stateline Glass & Mirror Inc.
May 12, 2006
Page Two

### Promissory Note

4. For this agreement to take effect and if the Company agrees to these terms, <u>an authorized representative of the Company</u> **must sign the agreement in the presence of a notary and return the original agreement by,** May 30, 2006, **along with one of the following:** (1) a bond in the amount of the note, with the Pension Fund as the sole payee, (2) Assignment of Claims on a current job project, and proof of the assignment, (3) a **signed** personal guarantee, or (4) an irrevocable letter of credit from your bank.

5. The first installment of $1,900.14 must reach the Fund Office no later than, May 30, 2006 along with the current reports and contributions as defined on "Exhibit A."

6. Although the Fund Administrator, Gary J. Meyers, has signed this Promissory Note, the Company understands the terms of the Note are ineffective unless each item referenced in paragraph five is provided to the Fund Office.

Sincerely,

*Gary J. Meyers*

Fund Administrator

The undersigned warrants and represents that he or she is a duly authorized representative of the Company, with full authority to bind the Company to this agreement. The undersigned and the Company agree that the foregoing constitutes a binding agreement between the Fund and the Company.

Signature: _____
Authorized Representative

Printed Name of Authorized Representative: _CURTIS W. ARFT_

Title: _President_

S.S.#: _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_

Company Name: _Stateline Glass + Mirror Inc_

Sworn and subscribed to before me on this _24th_ day of, 200_6_.

_Lana Arft_
NOTARY PUBLIC

My commission expires _3-24-09_

```
"OFFICIAL SEAL"
Lana Arft
Notary Public - State of Illinois
My Commission Expires 03/24/2009
```

Stateline Glass & Mirror Inc.
May 12, 2006
Page Three

## PERSONAL GUARANTEE
### Promissory Note

I, _Curtis W. Arft_ , have read and understand the foregoing agreement.  In consideration of the consent by the Fund to the agreement, I personally guarantee the payments that the Company has agreed to make, and agree as follows:

1.      If the Company fails to comply with the agreement at any time, I will pay all contributions, delinquencies, and amounts specified in the agreement, that the Company owes to the Fund, within ten (10) days after receipt of a written demand for payment by the Fund.  Delivery by first class mail to the following address shall be conclusive proof, though not the only means of proving my receipt of a written demand:

The address to which notice should be sent:

_372 Marshall Dr_

_Antioch, IL 60002_

2.      The Fund may demand payment from me at any time after a failure of compliance by the Company with this agreement, and I waive any defense of un-timeliness or dilatoriness against a demand for payment by the Fund.

3.      If I fail to pay on the terms set out here, I shall be liable under the same terms, and to the same extent, as the Company and my liability shall include the contractual and statutory liabilities of the Company.

Signature: _Curtis W. Arft_

Printed Name of Personal Guarantor: _CURTIS W. ARFT_

Home Address of Personal Guarantor: _372 Marshall Dr Antioch, IL 60002_

Home Telephone Number of Personal Guarantor: _____

Cell Phone # and Fax # of Personal Guarantor: _cell 847-815-2093   Fax 847-395-0784_

Relationship of Personal Guarantor to the Company: _President/owner_

Social Security Number of Personal Guarantor: _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_

Sworn and subscribed to before me on this _24th_ day of _May_, 200 _6_.

_Lana Arft_
NOTARY PUBLIC

My commission expires _3-24-09_

"OFFICIAL SEAL"
Lana Arft
Notary Public - State of Illinois
My Commission Expires 03/24/2009

# Amortization Schedule

Principal :          **$16,612.93**
Interest Rate :      **7%**
Instalment Period :  **9 Months**
Monthly payment :    **$1,900.14**

| Payment Number | Interest | Principal | Interest to date | Principal Balance |
|---|---|---|---|---|
| 1 | $96.91 | $1,803.23 | $96.91 | $14,809.70 |
| 2 | $86.39 | $1,813.75 | $183.29 | $12,995.95 |
| 3 | $75.81 | $1,824.33 | $259.10 | $11,171.62 |
| 4 | $65.17 | $1,834.97 | $324.27 | $9,336.65 |
| 5 | $54.47 | $1,845.67 | $378.73 | $7,490.98 |
| 6 | $43.70 | $1,856.44 | $422.43 | $5,634.54 |
| 7 | $32.87 | $1,867.27 | $455.30 | $3,767.27 |
| 8 | $21.98 | $1,878.16 | $477.27 | $1,889.11 |
| 9 | $11.03 | $1,889.11 | $488.30 | $0.00 |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| INTERNATIONAL PAINTERS AND ALLIED TRADES INDUSTRY PENSION FUND | ) ) ) | |
| Plaintiff | ) | CIVIL ACTION NO. |
| v. | ) | 1:06-CV-02168 (GK) |
| | ) | |
| STATELINE GLASS & MIRROR, INC. et al. | ) ) | |
| Defendants | ) | |

## <u>DECLARATION OF SANFORD G. ROSENTHAL</u>

Sanford G. Rosenthal, Esquire declares and states, the following:

1.      I am a shareholder with the law firm of Jennings Sigmond and presently serve as counsel to the International Painters and Allied Trades Industry Pension Fund ("Pension Fund") in this case. I am submitting this Declaration to document the attorneys' fees and costs which the Pension Fund has incurred in this case through July 23, 2007.

<u>Case Fees</u>

2.      Attached as Exhibit 5 to Plaintiff's Motion for Entry of Judgment by Default, and incorporated herein by reference, is a list showing all work performed by the office of Jennings Sigmond, P.C. and related costs in connection with the preparation of the Complaint and the Motion for Entry of Judgment by Default against Stateline Glass & Mirror, Inc. and Curtis W. Arft in this action through July 19, 2007. The listing was prepared from contemporaneous attorney time and expenses records and bills, the originals of which are maintained in the regular business records of Jennings Sigmond. Each piece of work is separately coded and the work performed is described. The fees relevant to this case are $3,617.00 and expenses are $926.39 for a total of $4,543.39.

185627-1



EXHIBIT

4

3.      The identity of those performing services related to this matter and normal hourly rates are as follows.

| INITIALS | NAME | TITLE | HOURLY RATE |
|----------|------|-------|-------------|
| SGR | Sanford G. Rosenthal | Shareholder | $220.00[1] |
| JAF | Jerome A. Flanagan | Associate | $220.00 |
| CTM | Cathy T. Morton | Paralegal | $ 70.00 |

4.      Plaintiffs only seek judgment for fees in the bills, which reflect a special fee schedule with the International Painters and Allied Trades Industry Pension Fund for a uniform $220.00 per hour rate for all lawyers and $70.00 per hour for paralegals and clerks.

Attorney Background and Experience

5.      Sanford G. Rosenthal.  Sanford G. Rosenthal is a firm shareholder and co-leader of the ERISA practice and has practiced law for 23 years. He received his undergraduate education at Pennsylvania State University, where he graduated in 1971. He worked as Audit Manager and Office Manager in the administrative team for the Teamsters Health and Welfare and Pension Funds of Philadelphia and Vicinity from 1971 through 1980. Mr. Rosenthal attended the Dickinson School of Law, where he was awarded the Degree of Juris Doctor in 1983.  Mr. Rosenthal is a member of the Bar of the Supreme Court of Pennsylvania and the District of Columbia Bar. He is also admitted to practice before the United States Court of Appeals for the Third Circuit and the United States District Courts for the Eastern and Middle Districts of Pennsylvania. His practice concentrates on the representation of multiemployer benefit funds in delinquency litigation and counseling. A sample of his litigation experience is

---

[1] Prior to June 2007, the hourly rate for attorneys was $200.00.
185627-1

available in 32 published cases that be obtained through a Westlaw search for "AT ("Sanford G.

Rosenthal") and Jennings" in the FPENS-CS library.

6.    <u>Jerome A. Flanagan</u>. Jerome A. Flanagan, an associate in the firm, has practiced

law for three (3) years. He graduated in 2000 from the University of Scranton, with a Bachelors

Degree in English.  He received his law degree in 2003 from Syracuse University. Following law

school, Mr. Flanagan served as a judicial clerk in Lackawanna County, Pennsylvania. Prior to

joining Jennings Sigmond, P.C., Mr. Flanagan practiced insurance defense in the Philadelphia

area.

7.    <u>Catherine T. Morton</u>. Catherine T. Morton is a Paralegal in the Jennings Sigmond

office. She has been with the office for six (6) years and is experienced in corporate computer

database research, electronic filing procedures throughout the country and preparation and

documentation of service of complaints and other pleadings for employee benefit collections

matters, in addition to other skills.

<u>Legal Market Benchmark</u>

8.    The time and fees charged in this case are reasonable based on prevailing market

rates for similar services by lawyers of reasonably comparable skill, experience and reputation in

both the Philadelphia and District of Columbia markets.

9.    My opinion that the time and fees are reasonable is based on a number of factors,

including the following.

(a)    We serve as counsel or co-counsel to over 20 multiemployer employee benefit

funds groups.  The firm currently has 16 lawyers, with a dedicated benefits department of six (6)

lawyers plus part-time work by three (3) other lawyers in the labor practice.  The work is

specialized and our competition often is large corporate firms with both employee benefits and

185627-1

federal litigation experience.  In my experience, our fees are normally substantially lower than the charges of larger firms.

(b)    The flat rate is this case is consistent with market rates in published surveys by Altman Weil, a leading law firm consultant.  A true and correct copy of the Altman Weil data is attached as Exhibit 6.  Specifically, Altman Weil found a median hourly rate in 2005 of $195 for associates in the Middle Atlantic region (encompassing both Philadelphia and the District of Columbia) and a range up to $273 per hour at the 90th percentile. See Associate Hourly Billing Rates (March 10, 2006), reprinted from http://www.altmanweil.com/PracticeSpecialtiesRates/. The median rate for partners (shareholders) in employee benefits litigation was $305 per hour, *id.*, Practice Specialties and Hourly Rates (October 1, 2005),   A $200 rate in 2006 is only a 2.56% increase over the 2005 median for associates only.

(c)    The fees are consistent with market ranges in a 2004 Ohio bar association survey, downloads.ohiobar.org/conventions/convention2005/session508%20Economics%20of%20Law. pdf, especially pages 26 and exhibit 27, especially after giving weight to increases from 2004 to 2006 (roughly 5% per year on average in the Ohio survey) and regional differences reflected in Altman Weil data, showing an 8.33% higher rate in median associates' rates in the Middle Atlantic region ($195) over the East North Central region covering Ohio ($180)).  A true and correct copy of the 2004 Ohio bar association survey is attached as Exhibit 7.  The Ohio survey showed median hourly associate rates in the comparable downtown Cleveland, Cincinnati and Columbus areas of $200 - $235 per hour, ranging up to $ 334 - $359 at the 90th percentile. See, Exhibit 7 (excerpt page 26).  It also shows that a $70 per hour paralegal rate is less than the median rate for 5 years experience in Ohio, without adjustment for regional differences, Exhibit 7 (Ex. 27).

185627-1

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Signed on: July 26, 2007

s/ Sanford G. Rosenthal
SANFORD G. ROSENTHAL, ESQUIRE
(I.D. NO. 478737)
The Penn Mutual Towers, 16th Floor
510 Walnut Street, Independence Square
Philadelphia, PA 19106-3683
(215) 351-0611/615
Attorneys for Plaintiff

OF COUNSEL:
JEROME A. FLANAGAN
Jennings Sigmond, P.C.
510 Walnut Street, Suite 1600
Philadelphia, PA 19106
(215) 351-0660

185627-1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| INTERNATIONAL PAINTERS AND ALLIED TRADES INDUSTRY PENSION FUND | ) | |
| | ) | |
| | ) | |
| Plaintiff | ) | CIVIL ACTION NO. |
| v. | ) | 1:06-CV-02168 (GK) |
| | ) | |
| STATELINE GLASS & MIRROR, INC. et al. | ) | |
| | ) | |
| Defendants | ) | |

**JENNINGS SIGMOND, P.C. July 2007 ATTORNEYS' FEES**

| Date | Attorney | Task | Time |
|---|---|---|---|
| 7/03/07 | JAF | Review of Documents<br>Preparation of Updates to Litigation Status Report | .5 |
| 7/11/07 | JAF | Review of Documents<br>Phone Conference with DC 14<br>Phone Conference with LU 27 Regarding Status of Company<br>Preparation of Correspondence to Thomas Montemore<br>Phone Conference with Thomas Montemore Regarding Updated Delinquency<br>Calculate Updated Delinquency<br>Preparation of Thomas Montemore Declaration | 2.2 |
| 7/12/07 | JAF | Phone Conference with Thomas Montemore<br>Phone Conference with Local Union<br>Review of Documents<br>Review of Correspondence from Peggy Gilbert (x6)<br>Review of Correspondence from Thomas Montemore (x2)<br>Preparation of Correspondence to Thomas Montemore and Peggy Gilbert (x2) | .6 |
| 7/13/07 | JAF | Preparation of Documents<br>Preparation of Request to Enter Default<br>Review of Updated Delinquency<br>Preparation of Motion for Default Judgment<br>Preparation of Memorandum<br>Review of Docket<br>Memo to File | 3.3 |
| 7/18/07 | CTM | Review of electronic court documents regarding notice | .2 |

185627-1



EXHIBIT
5

| 7/19/07 | JAF | Review of Documents | |
| | | Review and Revision of Motion for Default and Memorandum | |
| | | Regarding Individual Defendant | |
| | | Calculation of Attorneys Fees and Costs | |
| | | Preparation of Attorney Declaration | |
| | | Preparation of Exhibits | |
| | | Memo to File | 3.7 |
| 7/23/07 | JAF | Final Review of Motion, Memorandum and Exhibits Prior | |
| | | to Filing | .9 |
| | | **TOTAL** | **11.4** |

<u>July 2007 Summary</u>

| JAF | 11.2 Hrs. x $220 | = $ 2,464.00 |
| CTM | 0.2 Hrs x $70 | = $ 14.00 |
| July Total | | = $ 2,478.00 |

| 12/06 – 5/07 Fees & Costs | = <u>$ 2,065.39</u> |

**Grand Total** = **$ 4,543.39**

# Jennings Sigmond, P.C.
## Time And Expense Details

Beginning To End

Report ID:   OT2025 - 12470
Tuesday, July 24, 2007

Printed By   SLG
Page   1

| Client | Client Reporting Name | Matter | Matter Reporting Name | Billing Timekeeper |
|---|---|---|---|---|
| PTINTF | IUPAT Industry Pension Fund | 28563 | Stateline Glass & Mirror, Inc. | Sigmond, Richard B. |

### Billed Time

| Date | Timekeeper | Hours Worked | Hours On Bill | Rate | Amount Task | Activity | Narrative |
|---|---|---|---|---|---|---|---|
| 12/5/2006 | SMC | 0.50 | 0.50 | 200.00 | $100.00 | | Review of Correspondence from V. McGlone regarding Stateline Glass<br>Phone Conference with T. Montemore regarding Stateline Glass<br>Review of Bankruptcy Docket |
| 12/6/2006 | SMC | 0.10 | 0.10 | 200.00 | $20.00 | | Review of Correspondence from P. Gilbert |
| 12/7/2006 | SMC | 0.40 | 0.40 | 200.00 | $80.00 | | Review of Documents<br>Open File |
| 12/8/2006 | EAC | 1.80 | 1.80 | 200.00 | $360.00 | | Review of New File<br>Preparation of Complaint |
| 12/11/2006 | EAC | 0.50 | 0.50 | 200.00 | $100.00 | | Preparation of Memo to Client Regarding Litigation Status Report |
| 12/26/2006 | CTM | 0.20 | 0.20 | 70.00 | $14.00 | | Review of Electronic Court Documents regarding Summons and Complaint |
| 12/26/2006 | EAC | 0.10 | 0.10 | 200.00 | $20.00 | | Review of Complaint and Summons from Court |
| 1/17/2007 | EAC | 0.40 | 0.40 | 200.00 | $80.00 | | Review of Voicemail from Joe O'Donovan at Legal Errands<br>Preparation of Correspondence to Joe O'Donovan Regarding Alternate Addresses for Service |
| 1/25/2007 | EAC | 0.10 | 0.10 | 200.00 | $20.00 | | Review of Letter from Curtis Arft |
| 1/26/2007 | EAC | 0.10 | 0.10 | 200.00 | $20.00 | | Review of Letter from Curtis Arft<br>Memo to File |
| 2/2/2007 | SGR | 0.20 | 0.20 | 200.00 | $40.00 | | Office Conference with Attorney E. Coleman regarding Service Issue |
| 2/2/2007 | EAC | 0.40 | 0.40 | 200.00 | $80.00 | | Review of voice mail from Joe at Legal Errands; Conference with Attorney S. Rosenthal regarding service options; Phone conference with Joe O'Donovan |
| 2/16/2007 | EAC | 0.10 | 0.10 | 200.00 | $20.00 | | Review e-mail from Legal Errands |
| 3/6/2007 | EAC | 0.30 | 0.30 | 200.00 | $60.00 | | Review of Affidavit of Service<br>Memo to File |
| 3/8/2007 | CTM | 0.30 | 0.30 | 70.00 | $21.00 | | Phone Conference with Court Clerk regarding Service Upon Curtis Arft |
| 3/19/2007 | EAC | 0.10 | 0.10 | 200.00 | $20.00 | | Review of File for Alternate Address<br>Preparation of Correspondence to G. John Regarding Same |
| 3/30/2007 | EAC | 0.20 | 0.20 | 200.00 | $40.00 | | Review of Documents (Returned Mail to Defendants)<br>Computer Research |
| 6/5/2007 | EAC | 0.20 | 0.20 | 220.00 | $44.00 | | Preparation of Letter to Defendants Regarding Return of Service<br>Review of File |

| Post Date | Status | Entry Date | Original Post Period | Original Post Year |
|---|---|---|---|---|
| 07/03/2007 | Current Period | 06/05/2007 | 7 | 2007 |

### Billed Time

| | Totals | 6.00 | 6.00 | | $1,139.00 | | |
|---|---|---|---|---|---|---|---|

### Billed Expenses

| Date | | Amount | Exp Code | Narrative |
|---|---|---|---|---|

Report ID: OT2025 - 12470
Tuesday, July 24, 2007

## Jennings Sigmond, P.C.
## Time And Expense Details

Beginning To End

**Billed Expenses**

| Date | Amount | Exp Code | Narrative |
|------|--------|----------|-----------|
| 12/1/2006 | $13.80 | PO | Postage Charges |
| 12/14/2006 | $350.00 | 7100 | Complaint |
| 12/18/2006 | $12.11 | COPY | Photocopies |
| 12/23/2006 | $15.92 | SD | Special Delivery |
| 12/27/2006 | $19.18 | COPY | Photocopies |
| 3/7/2007 | $0.28 | COPY | Photocopies |
| 3/8/2007 | $423.10 | 7100 | Service Fee |
| 3/13/2007 | $0.00 | COPY | Photocopies |
| 6/1/2007 | $92.00 | PO | Postage Charges |

**Billed Expenses**

| Totals | $926.39 |
|--------|---------|

| | Hours Worked | Hours To Bill | Fee Amount | Expense Amount | Total Amount |
|--|--------------|---------------|------------|----------------|--------------|
| Report Totals | 6.00 | 6.00 | $1,139.00 | $926.39 | $2,065.39 |

*** End Of Report ***

# Associate Hourly Billing Rates by Region



Source: Altman Weil Survey of Law Firm Economics
2005 Edition

See following page for states included
in each region.



EXHIBIT
6



Census Regions and Divisions of the United States



Median Hourly Billing Rates
Litigation Specialties

Top Five
Hourly Rates

Equity and
Non-Equity
Partners

Source: Altman Weil Survey of Law Firm Economics
2005 Edition



**OSBA**

# THE 2004 ECONOMICS OF LAW PRACTICE IN OHIO SURVEY

### Introduction

During the spring of 2004, the Ohio State Bar Association, Section on Solo, Small Firms and General Practice (OSBA) surveyed the Ohio legal community on the economics of law practice. Two online surveys were utilized, replacing the single mail-based survey instrument provided in past years.

With respect to the economics of law practice, similar studies were undertaken in 2001, 1998, 1994 and 1990. The objectives of these studies were to determine, among other things:

- current demographics of practicing attorneys;

- attorney net income by practice category, gender, field of law, office location, work status, years in practice and firm size;

- associate, legal assistant, and secretary compensation by years of experience and office location;

- prevailing average hourly billing rates for attorneys by a variety of indicators, and rates for legal assistants by years of experience, firm size and office location;

- attorney time allocated to billable and non-billable professional activities; and

- overhead expenses associated with maintaining a private practice by office location and firm size.

Attorneys can compare themselves and their firms against "norms" established by the aggregation of survey data. Time series information is also provided to denote trends. Norms include statistics that are organized by combinations of office location, firm size, gender, work status (full-time vs. part-time), practice class, area of legal concentration and years of practice.

The above information has been consolidated into this reference to help guide attorneys as they plan and manage their professional lives.

For 2004, a survey dedicated to law office technology and marketing issues was also fielded at the same time as the economics survey. Findings from this survey are summarized as Current Issues on Law Office Technology and Marketing in Ohio, 2004 and are available at www.ohiobar.org

© 2004 Ohio State Bar Association. All rights reserved.

1

**EXHIBIT**

tabbies

7

## IV.   BILLING RATES AND PRACTICES

A.   Takeaways.

1.   The median hourly billing rate for all attorneys was *$175* for 2004 and *$110* for 1994. The average annual rate of increase in hourly billing rates during this time period was *5.9%.*

2.   Rates have increased the most in *suburban Cincinnati* (7.3% per year) and least in *suburban Columbus* (2.5%).

3.   Rates increased most for *partners in firms with 8+ partners* (5.9%) and least for *partners in firms with two to seven partners* (3.7%).

4.   *Rates increased the most for respondents in* firms with two to five attorneys (6.05%) and least for respondents in *firms with more than 20 attorneys* (4.2%).

5.   Rates increased the most for *estate planning attorneys* (9.5%) and *tax attorneys* (7.6%) and least for *bankruptcy* (2%) and *municipal/public entity* attorneys (- 1%).

6.   Fifty-six percent of respondents had *not changed* their rates in one year or more.

7.   When rates are raised, the prevalent increase is *6-10%* (41% of respondents).

8.   *Uncollectibles* (greater than 2% of fees billed) are increasing. The prevalent range is *3-8% of fees billed* (33% in 2004 and 30% in 2000).

9.   Attorneys are *increasingly adding service charges* to delinquent accounts where applicable (30% in 2004 compared with 20% in 1990).

B.   Implications.

1.   There is still pricing power for legal services despite intense competition and an ever growing supply of attorneys.

2.   Existing and new practice management benchmarks should be available, especially for solos and small firm practicing attorneys, to enable relative standing self assessments.

## V.   ATTORNEY TIME ALLOCATIONS

A.   Takeaways.

1.   The median value for *total hours* worked in 2004 rose to *50* from *48* in 1990 (2500 hours per year on a 50-week year).

**Law Firm Billing Rates and Billing Practices**

## 2004 Attorney Hourly Billing Rates

The reported 2004 median hourly billing rate is $200. The average is $206. While several interacting factors affect the setting and application of hourly billing rates, Exhibit 21 includes three discrete factors: respondents' firm size, years in practice and office location, while Exhibit 22 identifies respondents' primary source of income, and practice category.

**Exhibit 21**    **2004 HOURLY BILLING RATES BY FIRM SIZE, YEARS IN PRACTICE AND OFFICE LOCATION**

| | | Value by Percentile | | | |
|---|---|---|---|---|---|
| Size of Firm | N | Mean | 25th | Median | 75th | 95th |
| 1 | 196 | $155 | $125 | $150 | $175 | $225 |
| 2 | 55 | 164 | 125 | 150 | 185 | 250 |
| 3-6 | 77 | 176 | 150 | 175 | 200 | 256 |
| 7-10 | 40 | 196 | 150 | 180 | 244 | 300 |
| 11-20 | 39 | 189 | 155 | 195 | 225 | 275 |
| 21-50 | 49 | 206 | 163 | 200 | 238 | 320 |
| 51+ | 72 | 249 | 186 | 240 | 300 | 377 |
| **Yrs. in Practice** | | | | | | |
| 5 or less | 70 | $147 | $125 | $143 | $175 | $222 |
| 6-10 | 78 | 164 | 125 | 150 | 190 | 250 |
| 11-15 | 65 | 185 | 150 | 180 | 228 | 296 |
| 16-25 | 131 | 184 | 150 | 165 | 220 | 306 |
| More than 25 | 183 | 200 | 150 | 190 | 230 | 340 |
| **Office Location** | | | | | | |
| Greater Cleveland | 121 | $200 | $150 | $185 | $238 | $350 |
| Greater Cincinnati | 61 | 199 | 150 | 180 | 245 | 325 |
| Greater Columbus | 120 | 194 | 150 | 180 | 233 | 300 |
| Greater Dayton | 25 | 179 | 150 | 175 | 193 | 296 |
| Northeast Region | 98 | 165 | 125 | 163 | 196 | 250 |
| Northwest Region | 47 | 152 | 120 | 150 | 175 | 263 |
| Southern Region | 56 | 155 | 125 | 150 | 175 | 250 |
| Downtown Cleveland | 61 | $237 | $183 | $235 | $283 | $359 |
| Suburban Cleveland | 60 | 161 | 150 | 150 | 189 | 220 |
| Downtown Cincinnati | 40 | 213 | 153 | 200 | 271 | 368 |
| Suburban Cincinnati | 21 | 173 | 145 | 175 | 183 | 249 |
| Downtown Columbus | 67 | 217 | 165 | 210 | 260 | 334 |
| Suburban Columbus | 53 | 164 | 145 | 150 | 200 | 243 |
| Dayton | 25 | 179 | 150 | 175 | 193 | 296 |
| Canton | 12 | 154 | 116 | 153 | 183 | 250 |
| Akron | 41 | 186 | 150 | 190 | 223 | 273 |
| Toledo | 26 | 170 | 144 | 168 | 186 | 285 |
| Youngstown | 9 | 146 | 113 | 150 | 178 | 200 |
| Northeast Ohio | 36 | 149 | 125 | 138 | 188 | 225 |
| Northwest Ohio | 21 | 129 | 100 | 125 | 150 | 180 |
| Southeast Ohio | 16 | 155 | 125 | 150 | 188 | 250 |
| Southwest Ohio | 25 | 146 | 125 | 150 | 170 | 207 |
| Central Ohio | 15 | 171 | 150 | 165 | 185 | 250 |
| **All Attorneys** | 530 | $182 | $150 | $175 | $210 | $300 |

**Exhibit 22**    **2004 HOURLY BILLING RATES BY PRIMARY FIELD OF LAW AND PRACTICE CLASS**

| Primary Field of Law | N | Mean | 25th | Median | 75th | 95th |
|---|---|---|---|---|---|---|
| Administrative Law | 5 | $241 | $188 | $260 | $285 | $295 |
| Bankruptcy, Debtor | 18 | 135 | 115 | 150 | 168 | 190 |
| Collections | 10 | 146 | 119 | 135 | 164 | 250 |
| Corporate/Business Law | 48 | 201 | 150 | 183 | 225 | 340 |
| Criminal (Public Defendant) | 9 | 139 | 100 | 125 | 175 | 225 |
| Criminal (Private Defendant) | 12 | 154 | 125 | 150 | 173 | 250 |
| Domestic Relations/Family Law | 55 | 173 | 125 | 150 | 200 | 280 |
| Environmental Law/Natural Resources Law | 6 | 200 | 151 | 168 | 283 | 305 |
| General Practice | 14 | 136 | 118 | 132 | 161 | 185 |
| Health & Hospital Law | 6 | 203 | 148 | 195 | 263 | 300 |
| Intellectual Property | 10 | 216 | 174 | 223 | 250 | 300 |
| Labor Law (Management) | 6 | 185 | 150 | 168 | 236 | 255 |
| Employment Law (Management) | 25 | 187 | 138 | 175 | 238 | 324 |
| Employment Law (Labor) | 6 | 178 | 151 | 175 | 208 | 230 |
| Municipal/Public Entity Law | 8 | 164 | 111 | 138 | 225 | 305 |
| Product Liability | 5 | 226 | 138 | 205 | 325 | 425 |
| Personal Injury (Defendant) | 25 | 148 | 110 | 135 | 175 | 270 |
| Personal Injury (Plaintiff) | 43 | 179 | 150 | 160 | 200 | 300 |
| Professional Liability | 6 | 164 | 149 | 165 | 178 | 185 |
| Real Property Law | 26 | 164 | 125 | 150 | 195 | 315 |
| Taxation | 7 | 231 | 175 | 220 | 295 | 300 |
| Trial Practice, not PI (General Civil) | 20 | 190 | 140 | 177 | 200 | 415 |
| Trial Practice, not PI (Commercial) | 20 | 224 | 181 | 210 | 276 | 387 |
| Estate Planning/Wealth Management | 36 | 209 | 175 | 205 | 233 | 308 |
| Probate, Decedents' Estates | 49 | 176 | 150 | 175 | 200 | 250 |
| Workers' Compensation (Plaintiff) | 6 | 167 | 125 | 150 | 213 | 250 |
| Other | 23 | 200 | 150 | 190 | 250 | 358 |
| **Practice Classification** | | | | | | |
| Sole Practitioner | 168 | $153 | $125 | $150 | $175 | $225 |
| Solo with 1+ associates | 42 | 181 | 150 | 175 | 203 | 259 |
| Space Sharer | 21 | 160 | 125 | 150 | 175 | 275 |
| Partner in Firm with 2-7 Partners | 114 | 184 | 150 | 175 | 221 | 300 |
| Partner in Firm with 8+ Partners | 88 | 249 | 196 | 240 | 300 | 381 |
| Associate in Firm with 2-7 Partners | 31 | 156 | 125 | 150 | 175 | 264 |
| Associate in Firm with 8+ Partners | 56 | 180 | 150 | 175 | 210 | 263 |
| **All Attorneys** | 530 | $182 | $150 | $175 | $210 | $300 |

## Hourly Billing Rates for Associates and Legal Assistants

The distribution of hourly billing rates for associates and legal assistants are summarized by years of experience in Exhibit 23, by office location (Exhibits 24 and 25), and by firm size (Exhibits 26 and 27).

Exhibit 26    **DISTRIBUTIONS OF 2004 HOURLY BILLING RATES FOR ASSOCIATES BY FIRM SIZE AND YEARS OF EXPERIENCE**

| Associate Billing Rate Category | Firm Size (Number of Attorneys) | | | | |
|---|---|---|---|---|---|
| | 2 | 3-6 | 7-20 | 21+ | All |
| **No Experience** | | | | | |
| <$135 | 57.9 | 78.1 | 69.0 | 43.5 | 61.9 |
| $136-145 | 15.8 | 9.4 | 10.3 | 19.6 | 13.5 |
| $146-155 | 15.8 | 9.4 | 17.2 | 19.6 | 16.1 |
| $156-165 | | | 1.7 | 6.5 | 2.6 |
| $166-175 | 10.5 | | 1.7 | 4.3 | 3.2 |
| $176-199 | | | | 6.5 | 1.9 |
| $225-249 | | 3.1 | | | 0.6 |
| Total | 100% | 100% | 100% | 100% | 100% |
| **3 Years Experience** | | | | | |
| <$135 | 43.8 | 35.3 | 39.0 | 13.0 | 31.0 |
| $136-145 | 18.8 | 20.6 | 22.0 | 19.6 | 20.6 |
| $146-155 | 25.0 | 29.4 | 20.3 | 21.7 | 23.2 |
| $156-165 | | 11.8 | 6.8 | 13.0 | 9.0 |
| $166-175 | 6.3 | 2.9 | 6.8 | 23.9 | 11.0 |
| $176-199 | 6.3 | | 5.1 | 8.7 | 5.2 |
| Total | 100% | 100% | 100% | 100% | 100% |
| **5 Years Experience** | | | | | |
| <$135 | 12.5 | 24.0 | 25.0 | 4.3 | 16.9 |
| $136-145 | 25.0 | 8.0 | 10.7 | 10.6 | 11.0 |
| $146-155 | 12.5 | 40.0 | 25.0 | 10.6 | 22.1 |
| $156-165 | 12.5 | 12.0 | 17.9 | 17.0 | 16.2 |
| $166-175 | | 16.0 | 10.7 | 10.6 | 11.0 |
| $176-199 | 12.5 | | 10.7 | 29.8 | 15.4 |
| $200-224 | 25.0 | | | 14.9 | 6.6 |
| $225-249 | | | | 2.1 | 0.7 |
| Total | 100% | 100% | 100% | 100% | 100% |
| **10 Years Experience** | | | | | |
| <$135 | 33.3 | 14.8 | 19.5 | 5.4 | 14.9 |
| $136-145 | 11.1 | | 4.9 | 2.7 | 3.5 |
| $146-155 | | 22.2 | 14.6 | 5.4 | 12.3 |
| $156-165 | 22.2 | 7.4 | 4.9 | 5.4 | 7.0 |
| $166-175 | | 14.8 | 14.6 | 16.2 | 14.0 |
| $176-199 | | 18.5 | 26.8 | 18.9 | 20.2 |
| $200-224 | 22.2 | 18.5 | 14.6 | 18.9 | 17.5 |
| $225-249 | 11.1 | 3.7 | | 10.8 | 5.3 |
| $250+ | | | | 16.2 | 5.3 |
| Total | 100% | 100% | 100% | 100% | 100% |

Exhibit 27          DISTRIBUTIONS OF 2004 HOURLY BILLING RATES FOR
LEGAL ASSISTANTS BY FIRM SIZE AND EXPERIENCE

| Legal Assistant Billing Rate Category | Firm Size (Number of Attorneys) | | | | |
| --- | --- | --- | --- | --- | --- |
| | 2 | 3-6 | 7-20 | 21+ | All Firms |
| **No Experience** | | | | | |
| $50 or less | 40.0 | 60.0 | 50.0 | 20.0 | 41.0 |
| $51-60 | 30.0 | 20.0 | 20.0 | 17.1 | 20.0 |
| $61-70 | 10.0 | 4.0 | 10.0 | 5.7 | 7.0 |
| $71-80 | 20.0 | 8.0 | 10.0 | 25.7 | 16.0 |
| $81-90 | | 4.0 | 10.0 | 8.6 | 7.0 |
| $91-100 | | 4.0 | | 17.1 | 7.0 |
| $101-110 | | | | 5.7 | 2.0 |
| Total | 100% | 100% | 100% | 100% | 100% |
| **3 Years Experience** | | | | | |
| $50 or less | 12.5 | 25.0 | 13.3 | 2.8 | 11.7 |
| $51-60 | 62.5 | 35.0 | 23.3 | 11.1 | 24.5 |
| $61-70 | | 20.0 | 26.7 | 22.2 | 21.3 |
| $71-80 | | 10.0 | 13.3 | 11.1 | 10.6 |
| $81-90 | 12.5 | 5.0 | 10.0 | 22.2 | 13.8 |
| $91-100 | 12.5 | | 10.0 | 8.3 | 7.4 |
| $101-110 | | 5.0 | 3.3 | 8.3 | 5.3 |
| $111-120 | | | | 11.1 | 4.3 |
| >$120 | | | | 2.8 | 1.1 |
| Total | 100% | 100% | 100% | 100% | 100% |
| **5 Years Experience** | | | | | |
| $50 or less | 16.7 | 4.5 | 8.6 | 2.9 | 6.2 |
| $51-60 | | 27.3 | 17.1 | 5.9 | 14.4 |
| $61-70 | 66.7 | 22.7 | 11.4 | 14.7 | 18.6 |
| $71-80 | 16.7 | 31.8 | 34.3 | 11.8 | 24.7 |
| $81-90 | | 4.5 | 14.3 | 11.8 | 10.3 |
| $91-100 | | | 11.4 | 17.6 | 10.3 |
| $101-110 | | 9.1 | | 11.8 | 6.2 |
| $111-120 | | | | 11.8 | 4.1 |
| >$120 | | | 2.9 | 11.8 | 5.2 |
| Total | 100% | 100% | 100% | 100% | 100% |
| **10 Years Experience** | | | | | |
| $50 or less | 20.0 | | 2.7 | 3.0 | 3.9 |
| $51-60 | 20.0 | 9.1 | 18.9 | 3.0 | 11.8 |
| $61-70 | | 13.6 | 13.5 | 12.1 | 11.8 |
| $71-80 | 30.0 | 40.9 | 18.9 | 6.1 | 20.6 |
| $81-90 | 10.0 | 18.2 | 21.6 | 6.1 | 14.7 |
| $91-100 | | 13.6 | 16.2 | 18.2 | 14.7 |
| $101-110 | | 4.5 | | 12.1 | 4.9 |
| $111-120 | 20.0 | | 5.4 | 18.2 | 9.8 |
| >$120 | | | 2.7 | 21.2 | 7.8 |
| Total | 100% | 100% | 100% | 100% | 100% |

Exhibit 28 displays the impact of firm size on methods for client billing for legal assistants:

Exhibit 28          LEGAL ASSISTANT CLIENT BILLING METHODS BY SIZE OF FIRM, 2004

| Billing Method for Legal Assistants | Firm Size (Number of Attorneys) | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 1 | 2 | 3-6 | 7-20 | 21+ | All Firms |
| Included with Attorney Fee | 47.1 | 59.5 | 39.7 | 19.7 | 4.7 | 32.1 |
| Time | 42.9 | 35.1 | 55.2 | 73.8 | 87.5 | 60.7 |
| Fee Schedule | 8.6 | 5.4 | 5.2 | 3.3 | 6.3 | 5.9 |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |